## MAHONEY v. UNITED STATES.

The provision of the act of Congress of May 1st, 1810, fixing a salary to the consul at Algiers and assigning to him certain duties, treating that place as belonging to a Mohammedan power, ceased to be operative when the country, of which it was the principal city, became a province of France. The construction of the Secretary of State to this effect, impliedly sanctioned by the act of Congress of March 1st, 1855, "to remodel the diplomatic and consular systems of the United States" (10 Stat. at Large, 621), and expressly sanctioned by the act of August 18th, 1866, to regulate those systems. (11 Id. 52.)

APPEAL from the Court of Claims, the case being this:

An act of Congress, "fixing the compensation of public ministers and of consuls residing on the coast of Barbary,

and for other purposes," passed on the 1st of May, 1810,* provides that the President shall not allow " to any consul, who shall be appointed to reside at Algiers, a greater sum than at the rate of $4000 per annum as a compensation for all his personal services and expenses." Provision is made by the same act for salaries to consuls at Tangiers, Tripoli, and Tunis, other towns of the same coast.

At the time when this act was passed, Algiers was and had long been the capital, regency, or pachalic of the same name; one of the well-known Barbary States, a Mohammedan power, and dependent on the Ottoman empire; from which empire Turkish pirates had issued in early days, establishing themselves as sovereign masters of the city of Algiers. In 1830, a French army landed on the African coast, and after some fighting Algiers opened its gates, and the Dey gave up his city and government. The city then, A. D. 1831, became and still remains the capital of the French colonial province of Algeria; French tribunals, including at Algiers a tribunal of commerce, having largely displaced the native.

The act of 1810 above-mentioned, specified the sum which might be allowed to consuls residing at Algiers, *Tangiers, Tripoli, and Tunis*—all of them ports of what were known as the already mentioned Barbary States. It also provided that " no consul of the United States, residing in the *Barbary States*, should own, in whole or in part, a vessel, or be concerned in trade;" and some other provisions in the act showed that it had reference to a consul at Algiers† as a place under the control of one of these same states.

An act subsequent to the conquest of Algiers by the French —the act of March 1st, 1855—making provision for consuls in the " *Barbary States*," fixed a compensation for consuls at the last three named places italicized as above, but made no provision for the appointment or payment of a consul at Algiers; and a still later act—that of August 18th, 1856, making similar provision, and specifically mentioning the

---

* 2 Stat. at Large, 609.    † See §§ 4, 5, and 6.

last three, but not specifically mentioning Algiers—enacted that consuls for places not thus specifically mentioned should be entitled, as compensation for their services, to *such fees as they might collect.*

With this act of 1810 on the statute-book, but after the conquest of Algiers already mentioned, one Mahoney, in 1854, was appointed consul of the United States at the city of Algiers, in the north of Africa. He soon afterwards entered upon the discharge of his duties, and continued in office until November, 1859, when he resigned. During this period he received no salary from the government, *nor did he make any return to the government of fees received by him as consul, but he was paid the necessary expenses of his office, and was allowed by the Department of State to transact business as a merchant.* Whilst in office he preferred no claim for any salary or compensation for his services, nor did he afterwards advance any such claim until July, 1865. He then presented his claim for $4000 a year as salary to the Treasury Department. That department referred the matter to the State Department, and Mr. Seward, then Secretary of State, informed him that his claim could not be allowed. Its payment was accordingly refused. He then brought suit in the Court of Claims to recover the amount.

That court, which found as facts the matters stated in this last paragraph, dismissed the bill, holding among other things as matter of law, that from and after the recognition of Algeria by the United States as a province of France, the powers and duties of the consulate at Algiers were regulated and defined by the treaties of the United States with France, and that the consul became entitled to receive and hold his fees of office and to transact business, and was not entitled to receive the salary of $4000 per annum, authorized by the act of 1810, fixing the compensation of consuls residing on the coast of Barbary.

From this dismissal Mahoney, the claimant, appealed.

*Mr. T. J. D. Fuller, for the appellant,* contended that the conquest of Algiers by the French, and their taking possession

of it, could not repeal, annul, or even impair an act of Congress; that though the changed state of things, brought about by the conquest, was a good reason why Congress should alter the law passed before the change, yet if Congress did not alter it the law remained.

Nor could it be argued as a fact, he contended, that old Algiers had so completely ceased to exist as that the statute of 1810 became null. Neither town, port, nor people had disappeared from the exact place where they were. It was still the same city; a port of the sea frequented as before by merchants, and for commerce and trade. The only change was that it had ceased from being a power subject to Turkey, and had become a vice-royalty or dependency of France. But, he argued, that the office being a commercial, and not a diplomatic one, it mattered not whether Algiers became subject to the sovereignty of France, or remained subject to the Ottoman Porte. The port remained the same, and the laws regulating the consulate the same; just as if the island of Cuba should be ceded by Spain to any other European power, Havana would remain a commercial port, and the salary fixed by law to the American consul residing there also remain.

*Mr. Talbot, contra,* was stopped by the court.

Mr. Justice FIELD, after stating the facts as found by the Court of Claims, delivered the opinion of the court.

The language of the act of Congress of May 1st, 1810, would seem to indicate that the extent of the compensation to be made to the consul at Algiers was, within the limits prescribed, $4000 a year, subject to the control of the President, and that the amount specified was not payable absolutely to the person appointed. But assuming, for the purposes of this case, that the act fixes absolutely the rate of compensation, we do not think it sustains the claim of the appellant.

When that act was passed Algiers was a part of one of the Barbary States of that name, and it is evident, from an ex-

amination of its provisions, that the act was intended to apply to a consulate at that place only so long as it belonged to one of the Barbary powers. Years before the appointment of the appellant, Algiers, and the country of which it was the principal city, had become a province of France.

A great distinction has always been made between consuls to Mohammedan and consuls to Christian countries, both in the powers intrusted to them and in the duties with which they are charged. The full reciprocity which, by the general rule of international law, prevails between Christian states in the exercise of jurisdiction over the subjects or citizens of each other in their respective territories, is not admitted between a Christian state and a Mohammedan state in the same circumstances; and in our treaties with Mohammedan powers, express stipulations are made for the enjoyment by our citizens of certain exterritorial rights with respect to their persons and property. Whilst, therefore, in Christian countries consuls are little more than mere commercial agents, in Mohammedan countries they are clothed with diplomatic and even with judicial powers. Consuls to Christian countries are often allowed to engage in business; but consuls to Mohammedan countries are restricted to the duties of their offices, are paid a stated salary, and are prohibited from entering into commercial transactions.*

Thus, in the treaty with the Dey of Algiers, made in 1816,† it was stipulated that disputes between citizens of the United States should be decided by the consul; and in case a citizen of the United States should kill, wound, or strike a subject of Algiers, or, on the contrary, a subject of Algiers should kill, wound, or strike a citizen of the United States, the law of the country should "take place, and equal justice" be rendered, the consul assisting at the trial; and that the property of a citizen of the United States dying in Algiers should be under the immediate direction of the consul, unless otherwise disposed of by will.

---

* Halleck on International Law, chap. 10, §§ 21, 22; Opinions of the Attorneys-General, vol. vii, 346–348.

† 8 Stat. at Large, 244.

Provisions like these are not generally made in treaties between Christian nations; and they impose duties upon consuls which are not exacted of those officers when acting as mere commercial agents. It is plain that the duties for which a consul, inhibited from engaging in commerce, and charged with diplomatic and judicial functions, was required at Algiers, whilst that place formed part of a Mohammedan power, and this treaty was in force, ceased when that country passed under the jurisdiction of a Christian nation, and the treaty with the Dey thus expired. The Department of State from that time has treated the consulate there as one without salary, to which the provisions of the act of May, 1810, were no longer applicable; one which allowed the incumbent, as consuls in the countries subject to France are allowed, to engage in business, and only entitled to receive as compensation for his services such fees as he might collect, besides the necessary expenses of his office.*

The construction thus given by the secretary was impliedly sanctioned by the act of Congress of March 1st, 1855, "to remodel the diplomatic and consular systems of the United States,"† and was expressly sanctioned by the act of August 18th, 1856, to regulate those systems.‡

The act of 1810, after specifying the compensation which might be allowed to the consul appointed to reside at Algiers, designated the sum which might be allowed to other consuls appointed to reside in any other of the states on the coast of Barbary, thus making provision for all the Barbary States. The ports of these states, where consuls were appointed to reside, were Tangiers, Algiers, Tripoli, and Tunis. Now, in the act of March 1st, 1855, compensation is fixed, under the head of "Barbary States," for consuls to all those places except Algiers, and no provision is anywhere made for the appointment of a consul at that place, or for compensation to one there, showing that Congress did not then think that a consul with a salary there existed, or was there required.

The act of August 18th, 1856, enumerates the same places,

---

* 8 Stat. at Large, 106; 10 Id. 992.    † 10 Id. 621.    ‡ 11 Id. 52.

under the same head of Barbary States, at which consuls are to be appointed to reside, and designates their compensation, omitting, as in the act of 1855, the city of Algiers, and provides that consuls not thus enumerated shall be entitled, as compensation for their services, to such fees as they may collect, a provision which in effect declares, when read in connection with the preceding clauses of the act, that they shall receive no other compensation. And this latter act repeals all acts and parts of acts inconsistent with its provisions.

We find no error in the judgment of the Court of Claims, and it is accordingly

AFFIRMED.