Davis, J.,
delivered tbe opinion of the court:
This is an action to recover salary. Tbe claimant contends that be was a duly appointed consular officer of tbe United States, although not a citizen thereof at tbe period sued for, and that by reason of having bad judicial duties imposed upon bim be became entitled to tbe extra pay allowed by the Act August 14, 1848 (9 Stat. L., 276), to certain consuls peiforming such duties.
The Attorney-General first contends that the court is without jurisdiction in this case. As our jurisdiction may not extend to claims “ growing out of or dependent, on any treaty stipulation •entered into with foreign nations” (Rev. Stat., 1066), and as without tbe treaty with China there would have been no such act as tbe act of August 14, 1848, and without tbe treaty of 1830 with the Ottoman Porte there would have been nothing for tbe twenty-second section of that act to attach to, it is argued that tbe present claim grows out of a treaty and is bejrond our jurisdiction. We think that tbe connection between tbe claimant’s demand for salary and tbe treaty, by virtue of which tbe office to which tbe salary is supposed to attach is alleged to -exist, is not tbe direct and proximate connection which the statute contemplates. About forty treaties are now in force by which it is agreed that tbe United States may maintain consuls in tbe territories of as many independent powers; but it cannot be seriously contended that this court lias no jurisdiction over the demands of those consuls for salaries, because their consulates grow out of or depend upon treaties with foreign nations.
The Attorney-General also calls attention to a difference between tbe United States and the Ottoman Porte as to tbe construction of the treaty of 1830, which be contends is a question for tbe political department of the government. He maintains *71 that it is necessarily involved in the exercise of jurisdiction in this case, and that, therefore, we should stop at the threshold.
. The fourth article of that treaty, as printed in the Statutes at Large, provides that when American citizens within the dominions of the Ottoman Porte may have committed some offense they shall not be arrested and put in prison by the local authorities, but they shall be tried by their minister or consul and punished according to their offense, following, in this respect, the usages towards other Franks. (8 Stat. L., 409.) The Turkish ■Government denies the authenticity of the English text, and claims that the terms of the original Turkish text, which, they .say, was accepted by the American negotiator to be strictly observed on all occasions, does not affect the rights of the Turkish GoAmrnment with respect to the preventive arrest and holding-in custody of foreign subjects during criminal proceedings of which they may be the objects, and that it accords to Americans the same privilege which the subjects of other powers already enjoyed, viz, as they say, the leaving to the minister or consul the execution of the punishments to which Americans may be condemned in case of crimes or offenses. (United States Consular Regulations, ed. 1870, pp. 192, 193.)
The “usages of the Franks” begin in what are known in international law as “the capitulations,” granting- rights of ex-territoriality to Christians residing- or traveling in Mohammedan countries. Some ingenious writers attempt, to trace these capitulations far back of the capture of Constantinople in 1453 by the Turks. (1 Féraud-Giraud, Juridiction Francaise dans les Échelles, 29 et seq.) They are undoubtedly rooted in the radical distinction between Mohammedanism, which acknowledges the Koran as the only source of human legislation and the only law for the government of human affairs, and the western systems of jurisprudence, which are animated by the equitable and philosophical principles of Roman law and Christian civilization. But their accepted foundation in international law is in the 'Treaty made with the French in 1535, which guaranteed that French consuls and ministers might hear and determine civil and criminal causes "between Frenchmen without the interference of a Cadi or any other person. (1 De Testa, 16.) After this treaty the French took under their protection persons of other nationalities not represented by consuls (2 Féraud-Gi-raud, 76), and hence the generic name of “Franks” was given *72 to all participants in the privileges, and has been preserved in the laws, treaties, and public documents of the United States. (8 Stat. L., 409; 12 Stat. L., 76, § 21; 7 Op. Attys. Gen., 568.)
Other nations followed the examples thus set by the French, as, for instance, the English in 1675 (Brit. & For. St. Pap., 1812-’14, Part I, 750); the Two Sicilies in 1740 (1 Wenckius,. 522); Spain in 1782 (3 Martin’s Rec., 2d ed., 405); and the United States in 1830 (8 Stat. L., 408). All writers agree that by these and other similar capitulations a usage was established that Franks, being in Turkey, whether domiciled or temporarily, should be under the jurisdiction, civil and criminal, of their respective ministers and consuls. This usage, springing thus not only out of the capitulations, but out of the “very nature of Mohammedanism” (3 Phil., preface, iv), became a part of the international law of Europe (note to Spanish treaty cited above; 1 Guide Dip., § 75; Wheat. El., Lawrence’s ed. of 1863, 219-’22, Dana’s ed., § 110; 2 Phil., § 273; 1 Vattel, Pradier Fodéré ed., 625 n.; Bluntschli, Dr. Int. Cod., § 269; Calvo, Dr. Int., § 495).
In the ease of Triquet v. Bath (3 Burrows, 1478), which was argued by Blackstone, Tlmrlow, and Dunning, and decided in 1764 by the King’s Bench, Lord Mansfield giving the opinion, it was held to be beyond doubt that the law of nations is part of the common law of England; and that it is to be collected from the practice of different nations and from the authority of' writers. Blackstone incorporated this doctrine into his commentaries (Bl. Com., Book 4, ch. 5), which were first published soon after the decision was rendered. (See also Novillo v. Toogood, 1 B. & C., 562.)
That the law of nations forms part of our inheritance is a familiar doctrine, recognized by the highest tribunal. (30 Hogs-Sugar v. Boyle, 9 Crunch, 191.) The political department of the government has also uniformly insisted that persons under the protection of the United States shall enjoy in foreign lands all the rights, privileges, and immunities to which the law of nations entitles any foreigner. (Martin Kosta’s Case and many others.) Attorney-General Cushing, applying this doctrine, held it to be undoubted that all Franks were absolutely exempted, in controversies among themselves, from the local jurisdiction of the Porte (7 Op. Attys. Gen., 568), and the Supreme Court has recognized the general doctrine that consuls in Mohammedan countries are clothed with judicial powers, as part of *73 the public law of the United States. (Mahoney v. The Unite States, 10 Wall., 66.)
At the close of the Crimean war the Ottoman Empire was for the first time formally admitted into the family of nations. (Art. VII, Tr. of Peace, 3 Phil. Int. Law, 814.) It seems to have been thought that some further provisions as to the capitulations might become necessary (see Protocols),-but no steps were taken, and foreign consuls have continued to enjoy exterritorial jurisdiction (Dainese v. Hale, 91 U. S., 13; 2 Féraud-Giraud, preface), except in Egypt.
In the latter province the different systems of law which were thus enforced produced practical inconvenience and frequent conflict of jurisdiction. At length the Khedive, with the assent of the Sultan and of the different powers, promulgated a code for the regulation of the rights of foreigners in Egypt (Codes Egyptians, Alexandrie, 1875), and organized a mixed tribunal to administer that code. Congress, in 1874, authorized the President to suspend the operation of the act conferring judicial jurisdiction on ministers and consuls, so far as it affected Egypt, and to notify the Porte and the Khedive of the provisional acceptance of the new system. (18 Stat. L., 23.) This was done. The President then named three citizens of the United States for aiqjointment as judges in the new court. The Khe-dive, the Sultan assenting, appointed the nominees, and they are now serving there.
In view of all this, while we refrain from considering which text of the treaty of 1.830 is valid in our international relations, or Avhat is the true construction of either text, we can have no doubt that, at the time of the claimant’s alleged service, a con-sulaf office in Turkey was regarded as calling for the possible exercise of judicial functions. This may have been am element in influencing appointments, and a motive in inducing the acceptance of office. When a treaty, after acceptance by the Senate and exchange of ratifications, is promulgated in a given text which, so far as it relates to a general principle of public law, is in harmony with the opiniou of all publicists, and the legislature creates an office for the performance of quasi-international duties under that treaty and attaches a salary to it, and the President duly fills the office, and the incumbent takes possession of it, the latter is entitled to the salary, irrespective *74 ■of any diplomatic question as to tbe construction or validity of the treaty.
We therefore overrule the objections to our jurisdiction, and proceed to inquire whether the claimant held an office to which a salary was attached for the performance of judicial duties and whether he is entitled to such salary.
The alleged service extends over four distinct periods. During three of them the claimant, with the knowledge and implied assent of the Department of State, asserted Ids claim to be a vice-consul of the United States, by virtue of an appointment from the consul at Constantinople. During the fourth period he held the President’s commission as consul at Constantinople, and was en route to his post. With the view we take of the ■case, it is unnecessary to distinguish more particularly between the different periods.
It is contended at the outset that so much of the claim as relates to the alleged service as vice-consul cannot be maintained. It is said that inasmuch as the third article of the treaty of 1830-provides for the appointment of both consuls and vice-consuls, and the fourth article provides for the exercise of judicial powers by consuls and is silent as to vice-consuls, therefore it could not have been intended that vice-consuls should act as judges.
The argument rests entirely upon the language of the treaty; for the statutory provisions for executing the treaty clearly invest not only a vice-consul, but every consular officer who may be duly empowered by the Department of State and duly recognized by the Porte, with all the judicial powers authorized by the treaty. (9 Stat. L., pp. 279, 280, §§ 22, 23.) To that extent, therefore, Congress has construed the word “consul” in the fourth article of the treaty as a generic term; and the construction is reasonable and just. The word “ consul ” has two meanings. In its more limited sense it denotes an officer of a particular grade in the consular service; but in the second article •of the Constitution, authorizing the President to appoint consuls ; and in the third article, extending the judicial power to ■cases affecting consuls ; and in the statute of 1848, which we have been considering; and in the act of June 22, 1860, which replaced it (12 Stat. L., 72); and in the general instructions to consuls (Consular Regulations, passim); and in many treaties (Argentine Rep., 10 Stat. L., 1005; China, 16 Stat. L., 739; Madagascar, 15 Stat. L., 491; Morocco, 8 Stat. L., 484; Nic *75 aragua, 15 Stat. L., 549; Siam, 11 Stat. L., 683; Tripoli, 8 Stat. L., 214; Tunis, 8 Stat. L., 157) the word is used in a broader generic sense, and denotes all consular officers of whatever grade. This is its signification as employed in the fourth article of the treaty of 1830.
It is next urged that, prior to the year 1856, Congress had^ enacted no statute vesting the appointment of inferior consular officers in the President alone; that at the time of the alleged service a nomination to the Senate and confirmation by that body was necessary in order to entitle a person to hold the office of vice-consul of the United States; and that the claimant, not having' been thus appointed, was not a lawful incumbent of the office he claimed to hold.
The consular system of the United States originated in the treaties with France prior to the adoption of the Constitution. In the twenty-ninth article of the treaty of 1778 “ the two contracting parties grant mutually the liberty of having each in the ports of the other consuls, vice-consuls, agents, and commissaries, whose functions shall be regulated by a particular agreement.” (8 Stat. L., 28.) The “particular agreement” thus provided for is to be found in the consular convention of 1788, negotiated by Mr.'Jefferson. That convention having been concluded under the Confederation, and ratified and proclaimed under the Union, is entitled to weight in considering the Constitutional question suggested by the Attorney-General. Its first article provided that the consuls and vice-consuls of each party should be commissioned according to the forms respectively established by each, and should receive exequaturs from the other party. The third article authorized the respective consuls and vice-consuls to establish agents in the different ports and places in their departments. Nothing farther was said of commissaries. The word seems to have been adopted from an earlier treaty with Sweden (8 Stat. L., 74, Art. XXVI), and, with the exception of the treaty of 1832 with Iiussia (8 Stat. L., 448, Art. VIII), it disappears in subsequent treaties and legislation. As to vice-consuls, which is all we need consider, the treaty contemplated that they were to bear some form of commission and to receive exequaturs..
The twenty-fourth chapter of the acts of the Second Congress (1 Stat. L., 254) was enacted in part “ for the carrying into full effect the convention” of 1788 (§1), and in part “ for the direc *76 tion of the consuls and vice-consuls of the United States ” (§2). It contains no provisions respecting any consular officer except consuls and vice-consuls. It authorizes those officers to take charge of the estates of citizens of the United States dying within their districts, to administer upon them, and to charge and collect general fees; and it requires them, before entering upon the discharge of the duties of their office, to give bond for the faithful discharge of its duties, and for the accounting for money and property which may come into their hands by virtue of the act.
Until 1855 ho statute directed the appointment of consular officers of other grades. Yet officers of other grades did exist before that time, and were indirectly recognized by law. The revenue act of 1799 (1 Stat. L., 690), for instance, refers to the acts of consuls and agents; the act of 1803 supplementary to the act of 1792 (2 Stat. L., 203) assumes that there may be in the service consuls, vice-consuls, commercial agents, and vice-commercial agents; the customs law of 1823 (3 Stat. L., 737) provides for the verification of an invoice before a consul or a commercial agent; the law of 1835 relating to false invoices (1 Stat. L., 773) follows the act of 1803; the act of 1840 (5 Stat. L., 395) seems to assume that a consul and a commercial agent may be appointed to reside at the same port, the commercial agent being empowered to act in the absence of the consul; and the act of 1855 (10 Stat. L., 621), on the contrary, authorizes the appointment of an officer to be styled both consul and commercial agent. The act of 1856 (11 Stat. L., 52) first brought order out of this chaotic, crude, and to some extent contradictory legislation; separated the consular service into distinct grades; defined the powers, duties, and compensation of each; and pro-' vided a mode for the appointment of each. It is therefore quite clear that Congress, prior to 1856, did not attach definite ideas and significations to the terms which it used in order to describe grades in the consular service.
The executive departments were equally lax and vague. In 1790 Mr. Jefferson, as Secretary of State, addressed a circular to consuls and vice-consuls, in which he defines his ideas as to the distinction between those officials, and as to the powers of both over agents. He says:
“Our government thinks that to whatever there may be of honor or profit resulting from the consular office, native citizens are first entitled, where such of proper character will *77 undertake the duties; but where none such offer, a rice-consul is appointed of any other nation. Should a proper native come forward at any future time, he will be named consul; but this nomination will not revoke the commission of vice-consul; it will only suspend his functions during; the continuance of the consul within the limits of his jurisdiction, and on his departure therefrom it is meant that the vice-consular authority shall revive, of course, without the necessity of a reappointment. It is understood that consuls and vice-consuls have authority, of course, to appoint their own agents in the several parts of their district, and that it is with themselves alone those agents are to correspond.” (3 Jefferson’s Writings, 188.)
It thus appears that at that time consuls and vice-consuls were regarded as independent officers. There might or there might not be a consul in the district of a vice-consul; but the two officers could not exercise the powers of their offices at the same time in the same district. Hence, as Attorney-General Gushing has remarked (7 Op. Attys. Gen., 247), it was the practice in the early history of the government to appoint vice-consuls by nomination to the Senate. The record in this case shows how great innovations’ had come to be made on this usage. Th e Department of State is found to be recognizing as vice-consuls persons named and appointed by consuls, serving in the consulate contemporaneously with the consuls themselves, without warrantof appointment from the department.
We are constrained to think that the early practice was in harmony with the requirements of the Constitution, and that, in the absence of law authorizing a departure from that practice, it should be .followed. The claimant, having been appointed vice-consul without the approval of the Senate, is not entitled to be regarded as the lawful incumbent of the office, and cannot recover, on the facts in this suit, any salary for judicial duties alleged to be imposed upon him as vice-consul, even if it be granted by the act of 1848, which we shall soon consider.
The Attorney-General objects to his right to recover the remainder of his claim, because he was not at his post during the time that he held the President’s commission as consul, and performed no judicial duties.
Before the act of 1855 there was a want of uniformity in the usage of the Department of State respecting compensation of consuls. They were sometimes paid from the date of the commission, and sometimes from the date of the entry upon the discharge of the duties of the office. In 1855 Congress inaugu *78 rated tlie system of salaried consulates, and enacted that no consul should be entitled to compensation before reaching his post and entering upon his official duties. (10 Stat. L., 623, § 6.) This provision was repeated in the act of 1856 as to consular officers of classes B and C in that statute; but as to officers of class A, which embraces most of the Oriental consulates, a different rule was established and is still in force. (11 Stat. L., 56, § 8.)
in the absence of law or usage, we should be disposed, on the facts of this case, to allow the claimant compensation from the date of his commission if he were entitled to any compensation under the statute. But the Attorney-Gfeneral contends further, and, as we think, correctly, that the Act August 11, 1848 (9 Stat. L., 276), does not entitle consuls in Turkey to an additional compensation for the judicial duties which it imposes upon them.
The first seventeen sections impose upon the consuls in China a variety of judicial duties, both civil and criminal. The eighteenth section provides that in consideration of the duties both civil and criminal thus imposed upon the “ said consuls,” that is, upon the consuls in China, there shall be paid to each annually the sum of one thousand dollars in addition to his salary.
Tn the twenty-second section the provisions of the said act, “so far as the same relate to crimes committed by citizens of the United States ” — that is, the provisions of the first seventeen sections, so far as they relate to criminal, but not so far as thejT relate to civil jurisdiction — are extended to Turkey. But no provision is made for the extension of the provisions of the eighteenth section to the consuls in Turkey, because the consideration which is declared to have moved Congress to make the provision for the consuls in China failed in Turkey. The onerous civil litigations imposed upon the former were not imposed upon the laiiter, and the criminal cases were not regarded as sufficiently burdensome to call for an increase of pay.
Congress in two ways gave a contemporaneous construction of the act of 1848. 1st. In all the annual appropriations before the act of 1855 the additional pay of $1,009 each was granted to the minister and consuls in China, and none to the minister or consul in Turkey. 2d. Before 1849 it was the custom to *79 make an annual appropriation for interpreters, guards, and expenses of the consulates at Constantinople, Smyrna, and Alexandria. In 1849 salaries were, in addition, attached to the consulates at Alexandria and at Bey rout,; and these appropriations for expenses and salaries were annually repeated until the passage of the act of 1S55. The fact that appropriations were thus made for judicial pay in China and none in Turkey, and that other provisions were made for the Turkish consulates, furnishes proof conclusive to our minds that Congress did not regard the act of 1848 as endowing- the Turkish consulates with a judicial salary.
One other and the last point raised by the Attorney-General is equally fatal to the claimant, viz, that he furnished no bond, either as consul or as vice-consul, as required by the act of 1792.
“When a person has been nominated to an office by the President, confirmed by the Senate, and his commission has been signed by the President, and the seal of the United States affixed thereto, his appointment to that office is complete. Congress may provide, as it has done in this case, that certain acts shall be done by the appointee before he shall enter on the possession of his office under his appointment. These acts then become conditions precedent to the complete investiture of the office.” (The United States v. Le Baron, 19 How., 78.)
This language of the Supreme Court settles the point under consideration. If such conditions were precedent to the complete investiture of an office held by virtue of the President’s commission, they were still more so to the investiture of an office enjoyed by the acquiescence of the Department of State.In each ease the condition was not complied with by the claimant. Therefore he was not invested with either office so as to entitle him to recover any salary which, may have been attached to it, even if motives of public policy should induce an executive department or a court to give validity to his official acts.
The petition must be dismissed.