DAINESE v. HALE.

1. Judicial powers are not necessarily incident to the office of consul, although usually conferred upon consuls of Christian nations in Pagan and Mahometan countries, for the decision of controversies between their fellow-citizens or subjects residing or commorant there, and for the punishment of crimes committed by them.
2. The existence and extent of such powers depend on the treaty stipulations and positive laws of the nations concerned.
3. The treaty between the United States and the Ottoman Empire, concluded June 5, 1862 (if not that made in 1830), has the effect of conceding to the United States the same privilege, in respect to consular courts and the civil and criminal jurisdiction thereof, which are enjoyed by other Christian nations; and the act of Congress of June 22, 1860, established the necessary regulations for the exercise of such jurisdiction.

4. But as this jurisdiction is, in terms, only such as is allowed by the laws of Turkey, or its usages in its intercourse with other Christian nations, those laws or usages must be shown in order to know the precise extent of such jurisdiction.

5. The court cannot ordinarily take judicial notice of foreign laws and usages: a party claiming the benefit of them by way of justification must plead them.

6. The defendant, as Consul-General of Egypt, in 1864 issued an attachment against the goods of the plaintiff, tnere situate. The plaintiff, and the persons at whose suit the attachment was issued, were citizens of the United States, and not residents or sojourners in the Turkish dominions. For this act the plaintiff brought suit to recover the value of the goods attached. The defendant pleaded his official character, and, as incident thereto, claimed jurisdiction to entertain the suit in which the attachment was issued. *Held*, that the plea was defective for not setting forth the laws or usages of Turkey upon which, by the treaty and act of Congress conferring the jurisdiction, the latter was made to depend, and which alone would show its precise extent, and that it embraced the case in question.

ERROR to the Supreme Court of the District of Columbia.

This action was brought to recover the value of certain goods, chattels, and credits of the plaintiff, which the defendant, in November, 1864, then being Consul-General of the United States in Egypt, caused to be attached. The declaration alleged that the defendant, by usurpation and abuse of his power as such consul-general, and for the malicious purpose of injuring the plaintiff, took cognizance of a certain controversy between the plaintiff and Richard H. and Anthony B. Allen (all being citizens of the United States, and none of them residents of or sojourners within the Turkish dominions at that time), and made and issued the order of attachment by virtue of which the seizure in question was made.

The defendant pleaded, that, at the time of issuing the attachment, he was agent and Consul-General of the United States in Egypt, and was furnished with a letter of credence from the President of the United States to the Pacha; that in his said official capacity he exercised the functions and duties of a minister; and by the law of nations, as well as the laws of the United States, he was invested with judicial functions and power over citizens of the United States residing in Egypt, and, in the exercise of those functions, took cognizance of the cause referred to in the declaration, and issued the attachment complained of.

To this plea there was a general demurrer, which was overruled.

*Mr. F. P. Cuppy* and *Mr. S. S. Henkle* for the plaintiff in error, and *Mr. W. Penn Clarke* for the defendant in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

The defendant, by his plea, asked the court to take judicial notice that his official character gave him the jurisdiction which he assumed to exercise. Could the court do this? Can this court do it?

It cannot be contended that every consul, by virtue of his office, has power to exercise the judicial functions claimed by the defendant; for it is conceded that this is not the case in Christian countries. And whilst, on the other side, it is also conceded that in Pagan and Mahometan countries it is usual for the ministers and consuls of European States to exercise judicial functions as between their fellow-subjects or citizens, it clearly appears that the extent to which this power is exercised depends upon treaties and laws regulating such jurisdiction. The instructions given by the British Foreign Office to their consuls in the Levant in 1844, as quoted by Mr. Phillimore, do not claim any thing more. They say, —

" The right of British consular officers to exercise any jurisdiction in Turkey in matters which in other countries come exclusively under the control of the local magistracy depends originally on the extent to which that right has been conceded by the sultans of Turkey to the British crown; and, therefore, the right is strictly limited to the terms in which the concession is made. The right depends, in the next place, on the extent to which the Queen, in the exercise of the power vested in her Majesty by act of Parliament, may be pleased to grant to any of her consular servants authority to exercise jurisdiction over British subjects." Int. Law, vol. ii. p. 273, sect. 276.

Historically, it is undoubtedly true, as shown by numerous authorities quoted by Mr. Warden in his treatise on " The Origin and Nature of Consular Establishments," that the consul was originally an officer of large judicial as well as commercial powers, exercising entire municipal authority over his countrymen in the country to which he was accredited. But the

changed circumstances of Europe, and the prevalence of civil order in the several Christian States, have had the effect of greatly modifying the powers of the consular office; and it may now be considered as generally true, that, for any judicial powers which may be vested in the consuls accredited to any nation, we must look to the express provisions of the treaties entered into with that nation, and to the laws of the States which the consuls represent.

The transactions which are the subject of this suit took place in 1864; and the powers of our Consul-General in Egypt at that time must be regulated by the treaties with Turkey and by the laws of the United States then in force.

The first treaty between the United States and the Ottoman Porte was concluded in 1830; and, amongst other things, it provided, in Article III., that "American merchants established in well-defended States of the Sublime Porte for purposes of commerce shall not be disturbed in their affairs, nor shall they be treated in any way contrary to established usages." By Article IV., it was further provided as follows: —

"If litigations and disputes should arise between the subjects of the Sublime Porte and citizens of the United States, the parties shall not be heard, nor shall judgment be pronounced, unless the American dragoman be present. Causes in which the sum may exceed five hundred piasters shall be submitted to the Sublime Porte, to be decided according to the laws of equity and justice. Citizens of the United States of America, quietly pursuing their commerce, and not being charged or convicted of any crime or offence, shall not be molested; and, even when they may have committed some offence, they shall not be arrested and put in prison by the local authorities, but they shall be tried by their minister or consul, and punished according to their offence, following, in this respect, the usage observed towards other Franks."

In 1848 an act of Congress was passed, entitled "An Act to carry into effect certain provisions in the treaties between the United States and China and the Ottoman Porte, giving certain judicial powers to ministers and consuls of the United States in those countries." 9 Stat. 276. A treaty had been made with China in 1844, conceding to the authorities of the United States full civil and criminal jurisdiction between citizens of

the United States in that country. The law was passed in reference to this treaty and to that with the Ottoman Porte before cited.

This act contained regulations as to the mode of exercising the judicial powers stipulated for in the treaty with China. It conferred these powers upon the resident commissioner and consuls respectively, and authorized them to adjudicate in accordance with the laws of the United States and the common law, supplemented, when these were insufficient, by decrees and regulations to be made by the commissioner himself. The commissioner, with the advice of the consuls, was to prescribe the forms of process and proceeding. By the twenty-second section of the act, its provisions, so far as related to crimes committed by citizens of the United States, were extended to Turkey under the treaty of 1830, to be executed by the ministers and consuls of the United States in that country, who were *ex officio* vested with the powers given by the act to similar officials in China, so far as regarded the punishment of crime.

It is evident that this act failed to confer upon the consuls of the United States in Turkey any power to exercise judicial functions in civil cases, whatever may have been the scope and intention of the treaty of 1830. Whilst it may be true that the expression in the third article of the treaty, that American merchants shall not be disturbed in their affairs, nor treated contrary to established usages, was understood to and did confer upon American merchants the same privileges of exterritoriality enjoyed by the subjects of other Christian nations, the act of 1848 did not assume to enforce such a construction of it.

But, in 1860, another act was passed to carry into effect a new treaty made with China in 1858, and other treaties made with Japan, Siam, Persia, and other countries (12 Stat. 72), by which very full and explicit regulations were again made in reference to the exercise of judicial powers by ministers and consuls of the United States in those countries. By the twenty-first section of this act, the same declaration was made as in the twenty-second section of the act of 1848 in reference to the criminal jurisdiction to be exercised by the minister and consuls of the United States in Turkey; and a clause was added, giving them

civil jurisdiction also, as follows: "who [referring to such minister and consuls] are hereby *ex officio* vested with the powers herein conferred upon the minister and consuls in China, for the purposes above expressed, so far as regards the punishment of crime;" adding, "and also for the exercise of jurisdiction in civil cases wherein the same is permitted by the laws of Turkey, or its usages in its intercourse with the Franks or other foreign Christian nations."

So far, then, as the true construction of the treaty of 1830 would permit the exercise of civil jurisdiction by our consuls, the act of 1860 authorized it to be exercised, and supplied all the regulations necessary for that purpose.

In 1862 another treaty was entered into with the Ottoman Porte, by which, after confirming all such parts of the treaty of 1830 as were not abrogated or changed, amongst other things it was provided, in Article I., as follows: "All rights, privileges, or immunities which the Sublime Porte now grants or may hereafter grant to, or suffer to be enjoyed by, the subjects, ships, commerce, or navigation of any foreign power, shall be equally granted to and exercised and enjoyed by the citizens, vessels, commerce, and navigation of the United States of America." If, therefore, it be true, as laid down by writers and public documents, that the subjects of other Christian nations have and enjoy in Turkey the right to have their civil controversies decided by their own minister and consuls, it would seem clear, that under the treaty of 1862, if not under that of 1830, the same right is guaranteed to citizens of the United States.

But it is objected, that, in 1864, no act had been passed by Congress to carry the last treaty into effect. Such an act was passed in 1866, simply; however, extending to Egypt and the consul-general there the provisions of the act of 1860. Sect. 11 of Appropriation Bill, 14 Stat. 322. This clause was probably adopted merely to obviate any doubt on the subject. For as treaties made under the authority of the United States are, by the Constitution, declared to be part of the supreme law of the land, when they are complete in themselves, and need no supplemental legislation to carry them into effect, such legislation is not necessary for the purpose of giving them force and

validity. So far as relates to the jurisdiction in question, this is the character of the treaty of 1862, taken in connection with the act of 1860. The act gave the jurisdiction so far as usage in Turkey would permit it. The treaty secured the consent of the Turkish government to its exercise.

The State Department of the United States seems to have regarded the treaty of 1830 as establishing the jurisdiction in question. In the instructions contained in the "Consuls' Manual," promulgated by the department in December, 1862 (adopting the learned opinion of Attorney-General Cushing, dated Oct. 23, 1855), it is said that the acts of Congress of 1848 [and 1860] provide in terms for the exercise of judicial authority by ministers and consuls in Turkey only so far as regards the punishment of crime, leaving the question of civil jurisdiction to stand upon treaties or the peculiar public law of the Levant. § 165. And after referring to the language of Article III. of the treaty of 1830, which stipulated that "American merchants established in the well-defended States of the Sublime Porte for purposes of commerce . . . shall not be disturbed in their affairs, nor shall they be treated in any way contrary to established usages," and conceding that its construction might admit of discussion, the following conclusions were, nevertheless, reached: —

"As to all civil affairs to which no subject of Turkey is a party, Americans are wholly exempt from the local jurisdiction; and in civil matters, as well as criminal, Americans in Turkey are entitled to the benefit of 'the usage observed towards other Franks.' . . . The phrase in the second article engages that citizens of the United States in Turkey shall not be 'treated in any way contrary to established usages.' The 'established usages' are the absolute exemption of all Franks, in controversies among themselves, from the local jurisdiction of the Porte.

"The general doctrine thus in force in the Levant, of the exterritoriality of foreign Christians, has given rise to a complete system of peculiar municipal and legal administration, consisting of, —

"1. Turkish tribunals for questions between subjects of the Porte and foreign Christians.

"2. Consular courts for the business of each nation of foreign Christians.

" 3. Trial of questions between foreign Christians of different nations in the consular court of the defendant's nation.

" 4. Mixed tribunals of Turkish magistrates and foreign Christians, at length substituted in part for cases between Turks and foreign Christians.

" 5. Finally, for causes between foreign Christians, the substitution at length of mixed tribunals in place of the separate courts, — an arrangement introduced first by the legations of Austria, Great Britain, France, and Russia, and then tacitly acceded to by the legations of other foreign Christian nations." Consuls' Manual of December, 1862, §§ 169–171.

These conclusions, being publicly issued by the proper executive department of the government for the instruction and guidance of our consuls, are entitled to the highest respect in construing the statutes and treaties upon which their powers depend. And in view of the confirmatory as well as independent effect of the act of 1860, and the treaty of 1862, we have no doubt, that in 1864, when the transactions in question took place, the minister and principal consuls of the United States in Turkey (including the consul-general in Egypt) had all such jurisdiction in civil causes between citizens of the United States as was permitted by the laws of Turkey, or its usages in its intercourse with other Christian nations.

But here we are met by a difficulty arising from the extreme generality of the defence set up in the plea. What are the laws of Turkey and its usages in its intercourse with other Christian nations, in reference to the powers allowed to be exercised by their public ministers and consuls in judicial matters? The plea does not inform us. It leaves the court to infer or to take judicial knowledge of those laws and usages. But can it do this? Foreign laws and usages are, as to us, matters of fact, and not matters of law; and although the court may take judicial cognizance of many matters of fact of public importance, yet of foreign laws and customs, which are multiform and special in their character, it would be very dangerous for it to do so, at least without having had them brought to its attention and knowledge by previous adjudications or proofs. The general fact that public ministers and consuls of Christian States in Turkey exercise jurisdiction in civil matters between

their fellow-citizens or subjects might be assumed as sufficiently attested by the works on international law and the acts and instructions of our own government. But the precise extent of this jurisdiction is unknown to us. Whether it applies to any but residents in Turkey, or to travellers as well; whether to persons not in the country at all, but having property there, or claims against persons who are there; whether to cases like the present, where neither party resides in Turkey, or is sojourning there, — are questions which are not answered by the ordinary statements made in reference to this jurisdiction. As the power of the consuls of the United States, according to the treaties and laws as they stood in 1864, depended on the laws or usages of Turkey, those laws or usages should have been pleaded in some manner, however briefly, so that the court could have seen that the case was within them; for, failing to do this, the plea was defective in substance, and judgment should have been rendered for the plaintiff on the demurrer.

> *The judgment of the Supreme Court of the District of Columbia must be reversed, and the cause remanded with directions to allow the defendant to amend his plea on payment of costs.*