## TADAYASU ABO et al. v. CLARK et al.

## FURUYA et al. v. SAME.

### Nos. 25294, 25295.

District Court, N. D. California, S. D.

April 29, 1948.

Wayne M. Collins, of San Francisco, Cal., for plaintiffs.

Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., for defendants.

GOODMAN, District Judge.

Plaintiffs are approximately 2300 out of 5371 native born persons of Japanese ancestry, who signed renunciations of their American citizenship in 1945, pursuant to 8 U.S.C.A. § 801(i), while they were interned and imprisoned at Tule Lake Relocation Center in Modoc, California. These plaintiffs, by their amended complaint, seek a decree in equity rescinding their renunciations and declaring that they are still citizens and nationals of the United States. The issue tendered is without precedent and unique in the annals of American jurisprudence.

Of the 2300 plaintiffs, about 264 were heretofore ordered deported as alien enemies. Some were subsequently voluntarily released by the Department of Justice.

In actions 25296 and 25297, this court heretofore granted writs of habeas corpus, by which the remainder of the 264 referred to were released from the custody of the Immigration Authorities who were about to deport them to Japan. The Immigration Authorities claimed the right to deport these persons upon the ground that they became alien enemies, i. e. citizens of Japan, as a result of their renunciation of American citizenship. The reasons for the issuance of the writs of habeas corpus in these cases are set forth in my opinion, D.C. 76 F.Supp. 664.

In the instant causes, the renunciations are alleged to be void and ineffectual for the following reasons:

I. The renunciants acted (a) under pressure of duress and coercion induced by actions of the United States Government and by factions of disloyal co-internees, and (b) while in a state of mind, brought about by their evacuation and internment experience, rendering them impotent to act freely and voluntarily or competently and intelligently.

II. The renunciation hearings were unfairly conducted and were lacking in procedural due process.

III. 8 U.S.C.A. § 801(i) is unconstitutional.

It is also alleged that some of the renunciants were infants and insane persons.

The answer of defendants denies that plaintiffs were coerced or caused by duress to renounce their citizenship and avers that the renunciations were free and voluntary. Denial is also made of the charge of unconstitutionality of the renunciation statute and of unfairness of the renunciation hearings.

The answer does admit the following:

Detention of renunciants in a war relocation center surrounded by wire and guarded; existence of hostility to renunciants in various parts of the country which caused them apprehension at relocation; existence at Tule Lake of pro-Japanese organizations which engaged in propaganda programs and misrepresentations to persuade citizen internees to renounce their American citizenship; parental pressure exercised by alien parents upon their citizen children to induce

them to renounce for the preservation of the family unit, and to avoid induction into the armed forces.

The answer also alleges that certain of the plaintiffs were themselves members of the nationalistic Japanese organizations above referred to.

After the cause was at issue, both plaintiffs and defendants moved for summary judgment upon affidavits and documents filed. The documents consist of public records issued by the War Relocation Authority on the subject of Japanese Evacuation and Relocation, records of hearings held in February and March of 1942 before a House Committee Investigating National Defense Migration, and a book entitled "The Spoilage" dealing with Japanese American evacuation and resettlement.

The plaintiffs also moved for judgment on the pleadings. In addition, motions to strike portions of the pleadings were filed by both sides. Plaintiffs also moved to strike certain of defendants' affidavits.

Then on October 13, 1947, a stipulation was entered submitting the cause on the merits, upon the record as it stands including any evidence by way of affidavits and exhibits submitted on the motions previously made that are legally admissible as competent, relevant and material against the objections made thereto; provided, however, that if the court desired futher evidence in respect to any particular person, it may so order.

Certain of the affidavits making up the record are based upon facts ascertained from personal observation by individuals who appear to be unbiased. They are as follows:

Submitted by plaintiffs:
1. Tetsujiro Nakannra.
2. Masami Sasaki.
3. Rev. Thomas W. Crub.

Submitted by defendants:
1. John L. Burling.
2. Rosalie Bankey.
3. Thomas M. Cooley II, dated March 18, 1947 filed March 24, 1947.
4. Thomas M. Cooley II, dated January 9, 1947, filed January 27, 1947.

The documentary evidence proffered is voluminous and is corroborative and cumulative of matters contained in the affidavits. For these reasons and also because it is not the best evidence, the court has not considered the so-called documentary evidence. Neither has the court considered the so-called Abe Fortas letter, since it was stricken out on preliminary motion.[1]

In my opinion decision of the causes should be made without determining the alleged unconstitutionality of the renunciation statute.[2] The claim of the plaintiffs, that the so-called renunciation hearings were unfair, is unmeritorious, inasmuch as 8 U.S.C.A. § 801(i) required no hearings at all.

A study of the affidavits reveals that some renunciants acted freely and voluntarily. However, these are not the renunciants who are here seeking restoration of citizenship. Those who did act freely were members of the pro-Japanese organizations at Tule Lake, who have already been repatriated to Japan in accordance with their express wishes.

---

[1] This letter, pleaded again in the amended complaint, is the subject of defendants' motion to strike. The letter is also attached as an exhibit to the affidavit of Ernest Besig. It is a communication from the Under Secretary of the Interior in charge of the War Relocation Authority to Mr. Besig as head of the American Civil Liberties Union in Northern California, sent in August 1945. In this communication is an explanation of the reason for certain regulations adopted at Tule Lake. The explanation given tends to confirm the plaintiffs' contention that the primary factor which induced renunciation of citizenship by the plaintiffs herein was pressure exerted by the pro-Japanese groups at the Camp.

[2] The wisdom of abstaining from deciding Constitutional questions unless required to do so by the record of a particular case, has long been judicially recognized, Baker v. Grice, 169 U.S. 284, 18 S.Ct. 323, 42 L.Ed. 748; Arkansas Fuel Oil Co. v. State of Louisiana ex rel. Muslow, 304 U.S. 197, 58 S.Ct. 832, 82 L.Ed. 1287; Alma Motor Co. v. Timkin-Detroit Axle Co., 1946, 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128; Rescue Army v. Municipal Court, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; Hurd v. Hodge, 68 S.Ct. 847.

To recite in detail the circumstances existing at Tule Lake Camp at the time the renunciations were executed, as well as the prior history of conditions there, would be to write a story more appropriate for a book or similar literary effort. It is sufficient to say that the affidavits of both sides show agreement as to the combination of factors which lead to the execution of the renunciations. What disagreement there is concerns which factors were primary, and which subordinate, as to their effect and impact upon the plaintiffs. These factors were:

1. The internal pressure to renounce (by indoctrination of young and threats of violence against recalcitrant internees and their families) exerted by the two pro-Japanese factions at Tule Lake who were permitted to carry out nationalistic activities.

2. Parental pressure by alien parents on citizen children to prevent family break-up and avoid draft induction.

3. The fear of community hostility on release, leading to resort to renunciation in the belief it would assure further detention.

4. The conviction that the government would deport them in any event and, unless they renounced, they would be subject to reprisals on arrival in Japan.

5. Mass hysteria, the outgrowth of the combined experience of evacuation, loss of home, isolation from outside communication and concentration in an enclosed, guarded, overpopulated camp with little occupation, inadequate and uncomfortable living accommodations, dreary and unhealthful surroundings and climatic conditions,—producing neuroses built on fear, anxiety, resentment, uncertainty, hopelessness and despair of eventual rehabilitation.[3] I am satisfied that such factors, singly or in combination, cast the taint of incompetency upon any act of renunciation made under their influence by American citizens interned without Constitutional sanction, as were the plaintiffs.

United States v. Masaaki Kuwabara, D. C., 56 F.Supp. 716, decided July 22, 1944, was, in a manner of speaking, a "curtain raiser" to this proceeding. The United States Grand Jury for the Northern Division of the Northern District of California, on July 13, 1944, indicted 26 young American citizens of Japanese ancestry, then imprisoned at Tule Lake, for failing to report for pre-induction physical examination pursuant to the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 311. While I was holding the Eureka term of the court later that month, the United States Marshal brought these 26 young men to Eureka for arraignment. I appointed two leading attorneys to represent the defendants. Motions to quash the indictments were presented and were granted. In my opinion, I said: "It is shocking to the conscience that an American citizen be confined on the ground of disloyalty, and then, while so under duress and restraint, be compelled to serve in the armed forces, or be prosecuted for not yielding to such compulsion. * * * Defendant is under the circumstances not a free agent, nor is any plea that he may make, free or voluntary, and hence he is not accorded 'due process' in this proceeding." United States v. Masaaki Kuwabara, supra, 56 F.Supp. at page 719. I was subsequently advised that the Attorney General directed the United States Attorney not to appeal. The criminal proceedings consequently terminated.

It is true that the Constitutional safeguards in criminal proceedings, such as were taken in Kuwabara, may seem more important and vital than in civil proceedings. But they are of equal importance and vitality. It is only because their violation in prosecutions for crime so greatly offends the sense of justice that the safeguards themselves assume seemingly

---

[3] It must be kept in mind that Tule Lake was a center purposed not for relocation but for segregation, for the duration of hostilities. In this camp were detained without separation: (1) disloyal alien Japanese; (2) American citizens of Japanese ancestry who were regarded by Executive Officers of the Government as disloyal; and (3) American citizens of Japanese ancestry whose loyalty had not been questioned but who chose to remain at Tule Lake in preference to further removal to a relocation Center or because of reluctance to leave family members.

greater significance in criminal than in civil proceedings. Certainly the loss of American citizenship, described as "the highest hope of civilized man" (United States v. Schneiderman, 320 U.S. 118, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796), calls for the exercise of the most inflexible caution upon the part of the Government officials having the power to effectively take away "the priceless benefits." (United States v. Schneiderman, supra, Justice Murphy.)

Subsection (i), of Section 801 of Title 8 U.S.C.A. was added to Section 801 by the Congress on July 1, 1944. In general, Section 801 prescribes the "means of losing United States nationality." Subsection (i) provided an additional means, namely, the loss of United States nationality by resident nationals by filing a written renunciation "whenever the United States shall be in a state of war." It is admitted by the Department of Justice that subsection (i) was drawn by the Attorney General solely as a result of a request to him by the Chairman of the Sub-Committee of the House Select Committee To Investigate Un-American Activities, to recommend to the Committee some solution of the problem arising out of the detention of American citizens at Tule Lake Camp. The Attorney General recognized that there was no constitutional means by which American citizens, not charged with crime and not under martial law could be detained by administrative, military or civil officials or upon a mere administrative determination of loyalty. The Attorney General was thus required to exercise his ingenuity to ac-

complish the continued detention of the citizen group at Tule Lake Camp without doing violence to the Constitution. His recommendation for the enactment of subsection (i) was his answer. For by virtue of this legislation, if renunciations of American citizenship could be obtained from those in Tule Lake, it was thought they could then be detained as alien enemies without doing violence to our traditional constitutional safeguards. It is not fair to charge the officers of the Department of Justice with the full responsibility for the effects of Section 801(i).[4] The People of the United States acting through their representatives in Congress assembled, as well as the executive and administrative officers of government whose activities contributed to the unfortunate saga of Tule Lake, must all take that responsibility.

The Regulations promulgated by the Attorney General pursuant to the authority granted by Section 801(i), 9 P.R. 12241 make quite clear the statutory object and the purpose of the so-called renunciation hearings.[5]

Congress itself was fully aware of the purpose and objectives of the statute as proposed by the Attorney General. See House Report 1075 and Senate Report 1029 submitted in connection with H.R. 4102, 78th Congress 2d session.

The safeguards of the Constitution have fallen in earlier days in the face of the hysteria and exigencies of war. It has been stated that: "war stimulates lawless-

---

[4] There was of course no governmental design to entrap the unwilling citizen into renunciation, but merely to afford an opportunity to the willing to renounce. Mass renunciations by distraught citizens were not contemplated.

[5] 316.6 Hearing officer's recommendation. The hearing officer shall recommend approval or disapproval by the Attorney General of the applicant's request for approval of the former written renunciation of nationality. The hearing officer, in making his recommendation, is authorized to consider not only the facts presented at the hearing, but also results of any investigation and any information which may be available to him in reports of Government agencies or bur-

eaus, and from other sources, *relating to the applicant's allegiance and relating to the effect of renunciation of nationality upon the interests of national defense.* (Italics supplied.)

316.7 Approval or disapproval by Attorney General. The hearing officer's recommendation and the record of the hearing and any other facts upon which it is based, will be submitted to the Attorney General for his approval or disapproval of the applicant's formal written renunciation of nationality. *A renunciation of nationality shall not become effective until an order is issued by the Attorney General approving the renunciation as not contrary to the interests of national defense.* (Italics supplied.)

ness" and that "this was true of England during the Napoleonic Wars; it was true of the United States as a result of the World War." (Referring to World War I.)[6]

But it is incumbent upon the United States to now effectively and properly correct the evils resulting from ignoring Constitutional safeguards, just as was done in the past.

The court is not unmindful of the heavy responsibilities and burdens resting upon the executive and military officials due to the war with Japan and the dangers particularly affecting the west coast of the United States. But even expediency cannot remove the taint of unfairness with which the renunciations, subsequently executed, were clothed, because of the admitted objective of subsection (i).

There rested upon the Government the impossible burden, under these conditions, as well as those inherent in the detention of the plaintiffs at Tule Lake, of imparting fairness and regularity to the procedure of alleged renunciations.

In accepting the renunciations of the plaintiffs, the Attorney General was, of course, not only fully aware of the purpose of subsection (i) but also of all of the conditions existing at Tule Lake Camp at the time. The affidavits filed on behalf of the United States in this proceeding fully and without dispute so establish. Only a comparatively small number of renunciants acted with complete freedom of action, as evidenced by their subsequent acts in requesting repatriation followed by actual repatriation to Japan. Only as to this small number, may it be said that there was freedom from the factors which in law made the other renunciations, in the legal and equitable sense, involuntary and invalid.

The affidavit of John L. Burling, assistant to the Director of the Alien Enemy Control Unit of the War Division of the Department of Justice, filed by the Government, is enlightening. Mr. Burling unquestionably was the one officer of the Department of Justice who had the great-

est first-hand knowledge concerning conditions at Tule Lake and the setting in which the renunciation hearings were held. Among other things he said: "The Attorney General was then confronted with the necessity of making a recommendation either for the detention of American citizens not charged with crime and not under martial law by an administrative act of a military or civil official or of recommending a means of accomplishing the detention of this group *without violating the Constitution.*" The 48 page affidavit of Mr. Burling is a fair, temperate and dispasssionate statement of the circumstances backgrounding the renunciations. The following excerpts from pages 45 and 46 of his affidavit are indeed worthy of mention in this opinion:

"It is also patent that there was existing at Tule Lake at the time described a very high degree of excitement whipped up by organizations admittedly extremely pro-Japanese. It is also true, as has been stated, that most of the renunciations took place at the time when the renunciants and their families were in extreme fear of being forced out of the center into a hostile community and when they believed that the only way of making sure of protective detention during the war was to make themselves eligible for Department of Justice internment. If these factors and the hysteria render the act of renunciation by persons detained under these circumstances void, then the renunciations are void. If the court is now to hold that the totality of the circumstances described in this affidavit constitute coercion, then these renunciations were coerced. * * * It may be said that the hardships inflicted upon these persons were very great and that the hysteria and mental confusion was likewise great."

"* * * such renunciation could not be set aside as a result of a determination that legal coercion existed but only as an expression of the regret of the American people over the original act of evacuation and detention. If the renunciations are ultimately set aside, in affiant's opinion, that ultimate decision will only be justi-

---

6 "Mr. Justice Holmes and the Supreme Court," Felix Frankfurter, 1938, p. 53.

fied as a determination that the persons of Japanese ancestry resident on the Pacific Coast were so goaded that some of them took the foolish step of renunciation and that, because the moral blame is ultimately elsewhere, these persons shall not suffer the legal consequences of their own acts."

The chronology and history of the military and executive orders providing for the removal and relocation of American citizens of Japanese ancestry, as well as Japanese nationals, is set out in Ex parte Mitsuye Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, and need not be repeated here. In Ex parte Mitsuye Endo, as well as in Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194, and Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, the Supreme Court failed to pass upon the constitutionality of the detention of these American citizens of Japanese ancestry, beyond the period required for their orderly relocation, a proceeding protested by certain of the justices in dissenting and concurring opinions. In view of the admissions contained in the affidavits filed by defendants herein and the conceded purpose of Section 801(i), I have no doubt that there was a complete lack of constitutional authority for administrative, executive or military officers to detain and imprison American citizens at Tule Lake who were not charged criminally or subject to martial law.

It is contended by the Government that the coercion of the renunciants was not by the Government and that, ergo, there is no basis for cancelling renunciations. But the Government was fully aware of the coercion by pro-Japanese and by pro-Japanese organizations and the fear, anxiety, hopelessness and despair of the renunciants; and yet accepted the renunciations. Any one of the various factors, the existence of which is admitted by the affidavits, was adequate to produce, at least, a confused state of mind on the part of the renunciants and in which considered decision became impossible. The renunciants acted abnormally because of abnormal conditions not of their own making. We are not here concerned with whether or not the acts of the renunciants detrimentally affected other persons. The authorities cited by defendants, to support the contention that the duress recognized by equity as the basis for rescinding contractual obligations is absent here, are neither persuasive nor pertinent to the unique facts of these causes. There is adequate power in equity to right the wrong done to the plaintiffs—a wrong inherent in the objective of Section 801(i) and demonstrated by the admitted circumstances of renunciation. This judicial power has never been expressly limited nor circumscribed nor has the domain in which it functions been precisely bounded. 30 C.J.S., Equity, § 50, p. 387 et seq.

Indeed it is not inappropriate to apply to these causes the rationale of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. If a confession secured in a manner obnoxious to Congressional policy may not be used in a criminal case as evidence of guilt, it is equally true that a document relinquishing the priceless insignia of American citizenship should not be validated when executed in like manner.

The language in United States v. Masaaki Kuwabara, supra, may be appropriately paraphrased to fit this proceeding, viz.: "It is shocking to the conscience that an American citizen be confined *without authority* and then, while so under duress and restraint, for his Government to accept from him a surrender of his constitutional heritage."

The Government of the United States under the stress and necessities of national defense, committed error in accepting the renunciations of the greater number of the plaintiffs herein. The highest standards of public morality and the inexorable requirements of good conscience rest upon the Government in its dealings with its citizens. It must be slow to afflict and quick to make retribution. The Government must be neither reluctant nor evasive in correcting wrongs inflicted upon a citizen. By so doing it demonstrates to the people of the world the fairness and justice of our form of society and law. The Government need not sheepishly confess error; it must be stalwart and forthright in its recognition of injustice. By so doing, faith and confidence in our system of law will be maintained.

812

Upon the basis of the class showing made by plaintiffs, equity and justice require the entry of an interlocutory decree cancelling the renunciations and declaring plaintiffs to be citizens of the United States.

It may be that if the defendants were to go forward with further proof, they could present evidence that certain of the plaintiffs individually acted freely and voluntarily despite the present record facts.[7] Therefore, it is further ordered that defendants may have 90 days from date hereof within which to file a designation of any of the plaintiffs concerning whom they desire to present further evidence. As to any plaintiff, not so designated by the defendants within the time specified, a final decree may enter. As to any plaintiff designated in the manner and within the time specified, further hearings, after notice duly given, will be held.

---

[7] According to the affidavit of Thomas M. Cooley II, dated January 9, 1947, approximately 112 of the plaintiffs were Kibel who spent their formative years in Japan and were said to have been active members of pro-Japanese groups at Tule Lake.