**MEIJI FUJIZAWA v. ACHESON,**
**Secretary of State.**

**No. 981.**

United States District Court
S. D. California, S. D.

Aug. 23, 1949.

A. L. Wirin, Fred Okrand, Los Angeles, Cal., for plaintiff, Meiji Fujizawa.

James M. Carter, United States Attorney, Robert J. Kelleher, Assistant United States Attorney, Los Angeles, Cal., for defendant, Dean Acheson, Secretary of State.

WEINBERGER, District Judge.

Plaintiff, a person of Japanese ancestry, born in the United States, brings this action against the Secretary of State. Jurisdiction appears under the provisions of 8 U.S.C.A. § 903, plaintiff having applied at the United States Consulate at Kobe, Japan, to establish his claim as an American citizen and to register as a United States national, and said claim and registration having been denied by said United States Consul upon the ground that plaintiff had lost his United States nationality by obtaining naturalization in a foreign state. Plaintiff claims a permanent residence in this District, to-wit, in Imperial County, California.

At the trial of the cause, the plaintiff appeared and testified upon the witness stand; testimony of other witnesses was introduced through stipulations of counsel, in the form of affidavits and excerpts from transcripts of another trial held in this district.

Memoranda were filed by the respective counsel before and after trial, argument was had, and the matter submitted for decision.

Plaintiff alleges in his complaint that at no time he intended to, or desired to, lose his United States nationality, and that he did not lose his said nationality by virtue of any act performed by him, and that he did not obtain naturalization in Japan or in any foreign state; in the alternative, plaintiff alleges that if the Court finds that he did obtain the nationality of a foreign state, said obtaining of said nationality was not the free and voluntary act of the plaintiff within the meaning and intent of the United States Nationality Act, but was the result of mistake, misunderstanding and/or coercion.

Plaintiff also maintains that 8 U.S.C.A. § 801(a) as applied to the plaintiff is unconstitutional in that it deprives the plaintiff of his rights as a citizen of the United States as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Defendant admits that plaintiff was born in the United States, but denies that plaintiff has been a permanent resident of Imperial County, California, denies that plaintiff is a citizen of the United States, denies plaintiff's allegations that he did not lose his nationality as a United States citizen, and denies that he did not obtain naturalization in Japan.

Counsel for defendant in his brief filed December 23, 1948, at page 5 thereof, states the following questions are presented:

"(1) Did Fujizawa, a national of the United States by birth, lose his nationality under Title 8 U.S.C.A. § 801 (a) by 'obtaining naturalization in a foreign State either upon his own application, or * * *'"

"(2) Did Fujizawa's petition for restoration of Japanese citizenship (which he had renounced before leaving the United States) constitute 'naturalization' or did it merely restore him to the status he had had at birth, namely citizenship in the United States, and according to Japanese law, citizenship in Japan."

"(3) If the actions of Fujizawa in Japan, in obtaining a family register and securing the restoration of Japanese citizenship, constituted 'naturalization' under Title 8 U.S.C.A. § 801, did he do such acts in Japan under such pressure or duress, that the act was not free and voluntary."

The evidence here discloses that the plaintiff, of Japanese ancestry, was born in Imperial County, California, and following his graduation there from high school, went to Japan to further his education and to study the Japanese language, intending thereafter to return to the United States to engage in the export and import trade.

Prior to leaving the United States for Japan in June, 1939, in order to make certain that he retained his United States citizenship, and knowing that a Nisei was subject to the draft laws in Japan, he, through his father, took steps to renounce his Japanese nationality, which was accomplished in October, 1939, after plaintiff arrived in Japan.

In accordance with the provisions of Japanese law, every Japanese national possesses a personal record which is kept, together with the records of other members of his legal family, at a municipal office. On this record vital facts are reported, such as date of birth, name of spouse, offspring, military service, criminal record, etc.

These records are consulted extensively and it is a general practice to submit and require certified copies of one's Family Register Record in connection with applications for employment, marriage, negotiations, and in all other situations where background and status are important.

Plaintiff's father possessed such a Family Register on which the name of the plaintiff was also registered, and upon the plaintiff's renunciation of his nationality, his name was cancelled therefrom.

Plaintiff arrived in Japan in July, 1939, and then took up his studies, attending night classes, not desiring to take military training which was required of those attending the day classes.

After the declaration of war between the United States and Japan, on December 8, 1941, he continued his studies and graduated from said university in September, 1943.

Prior to the declaration of war, his parents, then residing in California, sent him money for his livelihood, and thereafter his relatives in Japan supported him until his graduation from the University after which he was unable to procure further funds and was required to find employment.

The evidence further discloses that when plaintiff applied for a position, he was informed that he could secure no employment unless his name appeared in the Family Register. He then applied at the City Hall in Tokyo for the registry of his name in the Family Register. An official asked plaintiff why he made such request and plaintiff gave as his reason that he was not getting any funds and needed a job for his livelihood. The official then advised plaintiff that he had to apply for a recovery of his Japanese nationality, and an application for such recovery was then made by plaintiff on a form filled out by the official.

Thereafter, in September of 1943, plaintiff received notice from the Home Ministry consisting of a simple statement that his application for recovery had been granted. He then opened his own Family Register which he used in procuring employment as an interpreter and in getting his rations. From September to November of 1943 he was employed as an interpreter by the Oeyama Nickle Industry Company, Limited

and thereafter and until V-J day was employed as an interpreter in the Oeyama Prisoners of War Camp where United States, Canadian, British and other war prisoners were detained; since V-J day, he has been employed by the United States military authorities in Japan as an interpreter.

While acting as such interpreter in the camp, the evidence discloses that he assisted the prisoners in many ways, contributing to their health and comfort in procuring for them medical supplies outside of camp such as sulphur compounds and vitamins, fruit, writing tablets and other necessities, thereby violating Japanese rules, and subjecting himself to disciplinary action if his activities had become known to his Japanese superiors.

It is of interest to note that at the close of hostilities, while plaintiff was so employed, a number of prisoners of war, including officers of the United States Army and Navy, and Canadian and British officers, on or about August 2, 1945, without any solicitation or request of the plaintiff gave to the plaintiff a document which was introduced in evidence which gave testimony as to the esteem in which these officers held the plaintiff, in terms as follows: "* * * Now that hostilities have ceased, we wish to go on record and state that although he is of Nipponese extraction, he has, under the most difficult circumstances, conducted himself in a manner worthy of merit and in accordance with the American idea of asssitance and fair play. He has proven himself to be an American under conditions where many, if not most, would have failed and we feel that he has performed his duty here to more effect than if he had been an American soldier on the front lines. * *"

On July 30, 1947, he applied at the United States Consulate at Kobe, Japan, to establish his claim as an American citizen, and to register as a United States national.

In connection with plaintiff's proceedings before the American Consulate in Yokahama, Japan, the plaintiff, on July 30, 1947, submitted to the American Consul a statement, a portion of which is as follows: "After completing the commercial course at Meiji University in September, 1943, I had to find some sort of job since no funds were available any more from my parents in the States. I accepted the job as interpreter (September 8, 1943 to cessation of hostilities in 1945) * * * of course I was given the job with the understanding that I make necessary arrangements to have my name in the Register. Under the circumstances I had no alternative * * finishing school, running out of money, placed under duress and pressure, situation I was in forced me to re-acquire Japanese citizenship. * * *"

Plaintiff further testified that he did not take any oath of allegiance to Japan in connection with any proceedings, and there is no evidence to the contrary; that he never made any formal renunciation of his American citizenship, and there is no evidence that he did; there is also evidence that plaintiff was never in the Japanese military service; that there were at least two elections during the time plaintiff was in Japan prior to the filing of this petition, and that plaintiff did not vote in either election. Plaintiff further testified that at all times he was loyal to the United States; that he never intended to abandon his United States citizenship; that he never intended to lose his United States citizenship.

The testimony of Thomas L. Blakemore, a resident in Japan who was formerly language officer in the United States Army, and formerly legal assistant in the Office of the United States Political Adviser in Tokyo, and at the time of the trial of this case, was employed under the Supreme Commander of Allied Powers as Chief of Civil Affairs and Civil Liberties Branch, Legislation and Justice Division, Legal Section, in Tokyo, Japan, was introduced by affidavit which by stipulation was considered a deposition. Mr. Blakemore's qualifications entitle him to be regarded as an authority on conditions in Japan during the period the plaintiff lived there, and his testimony concerning the influences surrounding a person of plaintiff's status during such period is entitled to great weight. It is summarized as follows:

During World War II the Nisei who had renounced their Japanese Nationality were

in a difficult position because of inability, as aliens, to obtain the generally used and accepted proof of identity available only to persons of Japanese Nationality, to-wit, copies of the Family Register Record; in Japanese society the Family Register Record is used for many purposes, and is a necessary step in connection with marriage, negotiations, schooling, employment and during time of rationing of food, clothing and housing, and when restrictions were placed on residence and movement about the country, the need for a Family Register Record became even stronger, and in some cases such Register might have become a prerequisite for survival; that the Japanese government provided for the support of neutrals and axis nationals in Japan, but no such protection was accorded persons of the Japanese race who possessed enemy nationality; they were not interned; such a person was "forced to fend for himself in a potentially hostile society, without even that protection which was afforded to Japanese detained in relocation centers in America, and also without the credentials of a Japanese." That lack of nationality on the part of a person of Japanese race would mark him as a renegade, and censure and criticism would be directed toward the family of such person; that at times such criticism could cause a powerful pressure upon the person concerned to take steps necessary to obtain the conventional identification of a Japanese; that almost all of the Nisei who lived in Japan at the outbreak of World War II who lacked a formal connection with a Japanese family, took steps to obtain Family Register Record credentials.

The testimony of Roger N. Baldwin was also introduced in the same manner as that of Mr. Blakemore; Mr. Baldwin testified he was invited by General MacArthur to serve as a consultant on civil liberties in Japan and Korea for a period of three months, and instead, he arranged to serve independently of official employment, in the capacity of representative of the American Civil Liberties Union, the World Federation of United Nations Associations and the Japanese American Citizens League; while in the capacity just described, Mr. Baldwin interviewed many people concerning the conditions in war-time Japan as the same affected American born Japanese present during such period, and he testified in part as follows: "Food and jobs were essential, and if one had to go through the incredibly simple process of becoming Japanese merely by signing his name or having a father do so, the food or the job seemed to warrant it. * * * They were generally ignorant of the complicated provisions of the naturalization laws of the United States and of Japan, and there were few lawyers capable of advising anybody."

Counsel for the defendant in a brief filed March 11, 1949, quotes from published articles prepared by Mr. Blakemore, wherein the latter sets forth provisions contained in the Japanese law, and interprets such provisions. With reference to the Family Register Record, Mr. Blakemore is quoted as stating that such registration is limited to Japanese nationals, and that the inability or reluctance to provide a copy of such record upon request normally would arouse suspicion of a person who purported to be a Japanese.

Counsel for defendant in said last mentioned brief, further quotes Mr. Blakemore concerning the provisions of the Japanese law on the subject of naturalization, to the effect that an alien may become naturalized in Japan with the permission of the Minister of Home Affairs, providing the alien has certain qualifications. Mr. Blakemore is quoted as stating: " 'Naturalization' requires the voluntary surrender or automatic extinction of any foreign nationality therefore possessed by the alien applicant.".

The quotations from Mr. Blakemore do not inform the Court, however, as to the manner in which the "voluntary surrender or automatic extinction" of any foreign nationality is accomplished, whether any affirmative act is required, such as a formal renunciation of foreign nationality, or whether an oath of allegiance to Japan must be taken.

Mr. Blakemore is again quoted, at page 8 of said brief, as stating, in an article entitled "Recovery of Japanese National-

ity" that "recovery" is a process which resembles naturalization in that it confers Japanese nationality on a non-possessor; that the "recovery" method of obtaining Japanese nationality is available only to former possessors who have lost their Japanese nationality through various means, one of which is mentioned as "renunciation made by the individual concerned or by his parents on his behalf;" Mr. Blakemore is quoted as stating that the authority to per-mit "recovery" is vested in the Minister of Home Affairs, and the brief sets forth the provisions which Mr. Blakemore quotes as being from the standard form of application for permission to "recover" nationality, as follows: "'The above described individual, who has lost Japanese nationality in accordance with the provisions of Section 2 of Article 20 of the Nationality Act and has obtained the Nationality of ————— country, now having returned to Japan for the purpose of residing here permanently and having become domiciled at the address hereinabove stated, and now being desirous of obtaining a "recovery" hereby makes application for a grant of permission to "recover" attaching herewith certain documents.'"

The attachments, Mr. Blakemore is quoted as stating, including a certificate of domicile from the Municipal mayor or Police Chief, a copy of the former Family Register Record, and a certificate as to birth in a foreign country.

While we presume that "Section 2 of Article 20" referred to in the quotations from Mr. Blakemore has to do with loss of Japanese nationality by renunciation, we cannot be certain; neither Mr. Blakemore nor any other expert on Japanese law appeared at the trial in person, and the Court was therefore unable to secure any interpretation of the laws of Japan pertinent to this case, other than as set forth in the brief of counsel for the defendant.

While we presume that the application which plaintiff testified he signed as an application for "recovery" was the standard form as quoted from Mr. Blakemore, and after which application plaintiff received a certificate to the effect that his "recovery" had been granted, we are unable to ascertain whether plaintiff was one who lost his Japanese citizenship under "Section 2 of Article 20" mentioned in the standard form. There is no evidence that in signing an application for "recovery" that plaintiff made any representations of allegiance to Japan, or any statement that he renounced his United States citizenship, or that he took any "oath of allegiance" to Japan. In fact, plaintiff testified, as we have hereinbefore mentioned, that at the time he signed the application for "recovery" he was asked his reasons therefor by the official who filled out the application and that he, the plaintiff, told said official it was for the purpose of obtaining a job. It is also a fact that plaintiff did not come within the provision of the standard application, "now having returned to Japan for the purpose of residing here permanently" because the evidence is clear that plaintiff came to Japan only temporarily, and for the purpose of learning the Japanese language, in order that he might use said language in his business in the United States, and we must deduce that if plaintiff had any intention of residing in Japan permanently at the time he returned there, he would not have, with deliberation, renounced his Japanese citizenship.

We are reluctant to interpret the laws of a foreign country upon the insufficient showing which we have before us as to such laws. See: Dainese v. Hale, 91 U.S. 13, 23 L.Ed. 190; United States ex rel. Zdunic v. Uhl, 2 Cir., 137 F.2d 858, 861; Chicago Pneumatic Tool Co. v. Ziegler, 3 Cir., 151 F.2d 784, 793.

Were we compelled to make such interpretation in order to decide this case we would incline to the view that question (1) presented in the brief of defendant filed December 23, 1948, should be decided by a conclusion that Fujizawa did not obtain naturalization in Japan, and that question (2) should be decided by a conclusion that the granting of Fujizawa's application for recovery had no legal effect other than to restore him to the status he had at birth, that of dual citizenship.

We believe, however, that this case should be decided upon a consideration of whether the acts of Fujizawa which the

defendant claims caused Fujizawa to lose his United States citizenship were his free and voluntary acts and whether there was any intent to renounce his United States citizenship.

The opinions in the following cases, the first two of which are cited by the defendant, stress the importance of the principle that the act or acts which it is contended caused the loss of citizenship must have been the free and voluntary act or acts of the citizen: Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860; In re Bolter, D.C., 66 F.Supp. 566; Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320; Attorney General of U.S. v. Ricketts, 9 Cir., 165 F.2d 193; Tadayasu Abo. v. Clark, D.C., 77 F.Supp. 806; Schioler v. U. S., D.C., 75 F.Supp. 353.

It is true that plaintiff did not testify that any direct threats of physical violence were made to him to render his acts other than free and voluntary, but we believe plaintiff's statement to the American Consul in Japan, and his testimony on the witness stand that he made his application for "recovery" under duress and pressure. Plaintiff's contention is further supported by the testimony of Thomas L. Blakemore and Roger Baldwin to which we have hereinbefore adverted.

Plaintiff's actions before and after the making of the application for "recovery" negative any intention to renounce his status as a citizen of the United States, and show a lack of attachment to Japan; plaintiff's procedure in setting in motion his renunciation of Japanese citizenship before he left the United States; the fact that he left the United States only for the purpose of learning the Japanese language in order that he might engage in a business in the United States which made a knowledge of such language useful; the fact that he was in Japan over four years, a year and a half of which period was during the war, before he made his application for recovery; the fact that he avoided military service in Japan, though as a Nisei he was subject to such service; the fact that during the war he gave aid and comfort to enemies of Japan, at the risk of his personal safety.

We hold, therefore, that in the light of conditions shown to exist, and considering plaintiff's acts before and after such application, that the application for "recovery" which the defendant contends resulted in the loss of plaintiff's United States citizenship, was not the free and voluntary act of the plaintiff; that plaintiff never, at any time intended to renounce or relinquish his United States citizenship; that plaintiff is, and has been, since his birth, a citizen of the United States.

In view of our decision as set forth above we deem it unnecessary to consider the constitutional question raised by plaintiff.