**UNITED STATES v. SCHNEIDER-MAN et al.**

**UNITED STATES v. SPECTOR et al.**

Nos. 21888, 21940.

United States District Court
S. D. California.
Central Division.

Nov. 28, 1951.

See also, D.C., 102 F.Supp. 87; 191 F.2d 692.

Ernest A. Tolin, U. S. Atty., Walter S. Binns, Asst. U. S. Atty., Norman Neukom, Asst. U. S. Atty., Ray H. Kinnison, Asst. U. S. Atty., all of Los Angeles, Cal., for the United States.

Margolis & McTernan, by Ben Margolis, Los Angeles, Cal., for all defendants.

Daniel G. Marshall, Los Angeles, Cal., for defendant Philip Marshall Connelly (for bail purposes only).

Alexander H. Schullman, Los Angeles, Cal., for defendant Philip Marshall Connelly and Dorothy Rosenblum Healey.

Leo A. Branton, Jr., Los Angeles, Cal., for defendant Henry Steinberg, Ben Dobbs.

Leo A. Sullivan, Oakland, Cal., for defendants Albert Jason Lima and Carl Rude Lambert.

A. L. Wirin, Los Angeles, Cal., for defendants Rose Chernin Kusnitz, Al Richmond, and Frank E. Spector.

Norman Leonard, San Francisco, Cal., for defendants Loretta Starvus Stack, Ernest Otto Fox, and Frank Carlson.

MATHES, District Judge.

The defendants in these two cases are under indictment charged with conspiracy "to commit offenses against the United States" prohibited by Section 2 of the Smith Act, 54 Stat. 671 (1940), 18 U.S.C. (1946 ed.) § 10, and 18 U.S.C. (1948 ed.) § 2385, "by so conspiring * * * to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence, and * * * to organize and help organize as the Communist Party of the United States of America a * * * group * * * of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence * * *."

Bail as to each of the defendants in the two cases has been fixed at $50,000, and all fifteen are presently in the custody of the marshal in default of bail. The twelve defendants in No. 21883 are now before the court on motions to reduce bail. See Stack, v. Boyle, 72 S.Ct. 1, id. 9 Cir., 192 F.2d 56; Connelly v. District Court, 9 Cir., 1951, 191 F.2d 692. Although the three defendants in No. 21940—Spector, Carlson and Dobbs —are likewise detailed in default of $50,000 bail and are represented by three attorneys who individually appear for one or more of the defendants in No. 21883, no move seeking reduction of their bail has been made. Both defendants Carlson and Spector are aliens. See Carlson v. Landon, 9 Cir., 1950, 186 F.2d 183; id. 9 Cir. 1951, 187 F.2d 991; United States v. Spector, D. C., S.D.Cal. 1951, 99 F.Supp. 778.

As Mr. Chief Justice Vinson recently declared for the majority of the court in Stack v. Boyle, supra [72 S.Ct. 3]:

"From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a) (1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See Hudson v. Parker, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424. * * *

"The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. Ex parte Milburn, 1835, [34 U.S. 704] 9 Pet. 704, 710, 9 L.Ed. 280. Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused. Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the Eighth Amendment. See United States v. Motlow, 10 F.2d 657 (1926, opinion by Mr. Justice Butler as Circuit Justice of the Seventh circuit).

"Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. The traditional standards as expressed in the Federal Rules of Criminal Procedure are to be applied in each case to each defendant."

Rule 46(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., directs that: "If the defendant is admitted to bail, the amount thereof shall be such as in the judgment of the * * * judge * * * will insure the presence of the defendant, having regard to [1] the nature and circumstances of the offense charged, [2] the weight of the evidence against him, [3] the financial ability of the defendant to give bail and [4] the character of the defendant."

So it is the duty of the court, in considering the pending motions, to determine whether and, if so, to what extent the bail of $50,000 heretofore fixed as to each

of the defendants exceeds the amount which will give adequate assurance of the presence of the accused, having regard to the traditional standards expressed in the above quoted provisions of Rule 46(c).

The first of these traditional standards involves "the nature and circumstances of the offense charged".

The defendants at bar are charged with the offense of which Gus Hall, Gilbert Green, Henry Winston, Robert G. Thompson and others were convicted in Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Id., 2 Cir., 1950, 183 F.2d 201.

Indeed the defendants in the Dennis case are charged as "co-conspirators but not defendants" in the indictments here, and with the defendants at bar and "divers other persons" stand accused of what appears in substance to be the identical conspiracy of which Dennis and others were convicted in the Southern District of New York. United States v. Foster, D.C., S.D.N.Y.1949, 9 F. R.D. 367, 374–375.

With respect to the nature of such an offense, Mr. Chief Justice Vinson said for the court in Dennis v. United States, supra, 341 U.S. at pages 497–498, 510–511, 71 S.Ct. at page 861:

"[The Court of Appeals] held that the record in this case amply supports the necessary finding of the jury that petitioners, the leaders of the Communist Party in this country, were unwilling to work within our framework of democracy, but intended to initiate a violent revolution whenever the propitious occasion appeared. * * *

"* * * the Court of Appeals held that the record supports the following broad conclusions: * * * that the Communist Party is a highly disciplined organization, adept at infiltration into strategic positions, use of aliases, and double-meaning language; that the Party is rigidly controlled; that Communists, unlike other political parties, tolerate no dissension from the policy laid down by the guiding forces, but that the approved program is slavishly followed by the members of the Party; that the literature of the Party and the statements and activities of its leaders, petitioners here,

advocate, and the general goal of the Party was, during the period in question, to achieve a successful overthrow of the existing order by force and violence. * * *

"The mere fact that from the period 1945 to 1948 petitioners' activities did not result in an attempt to overthrow the Government by force and violence is of course no answer to the fact that there was a group that was ready to make the attempt. The formation * * * of such a highly organized conspiracy, with rigidly disciplined members subject to call when the leaders * * * felt that the time had come for action, coupled with the inflammable nature of world conditions, similar uprisings in other countries, and the touch-and-go nature of our relations with countries with whom petitioners were in the very least idealogically attuned, convince us that their convictions were justified on this score. * * * It is the existence of the conspiracy which creates the danger."

Moreover, as Mr. Justice Douglas put it in Pinkerton v. United States, 1946, 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489:

"A conspiracy is a partnership in crime. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 858, 84 L. Ed. 1129. It has ingredients, as well as implications, distinct from the completion of the unlawful project. As stated in United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 684, 685, 59 L.Ed. 1211:

"'For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered.'"

See also the concurring opinion of Mr. Justice Jackson in Dennis v. United States,

58

supra, 341 U.S. at pages 573–574, 71 S.Ct. 857.

The Smith Act originally provided maximum punishment of ten years imprisonment and $10,000 fine for violation of "any of the provisions," including § 3 which forbade a conspiracy to do "any of the acts" prohibited by § 2, 54 Stat. 671, §§ 2, 3, 5 (1940). Proof of an overt act was not an essential element of the crime of conspiracy defined in § 3. See Dennis v. United States, supra, 341 U.S. at pages 574, 590, 71 S.Ct. 857.

. Sections 2, 3 and 5 of the Smith Act later became §§ 10, 11 and 13 of Title 18 of the United States Code, 54 Stat. 670, 671 (1940). And when Title 18 of the United States Code was revised in 1948, the conspiracy section, 18 U.S.C. (1940 ed.) § 11 was repealed, 62 Stat. 867 (1948), leaving a conspiracy to commit the acts prohibited by § 2 of the Smith Act to be punished under the general conspiracy statute, 18 U.S.C. (1948 ed.) § 371, which, interestingly enough, does require an overt act "to effect the object of the conspiracy" as an essential element of the offense, while providing a lesser penalty of "not more than five years" imprisonment.

Punishment-wise, then, "the nature * * of the offense charged" is no more serious than fraudulent mutilation of a five-cent piece, 18 U.S.C. § 331, misuse of evidence of citizenship, 18 U.S.C. §§ 1423, 1424, 1428, willful issuance of a false crop report, 18 U.S.C. § 2072, interstate transportation of a stolen automobile, 18 U.S.C. § 2312, or of two stolen cows, 18 U.S.C. § 2316; and is only one-half as serious as a conspiracy to intimidate a citizen "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States" 18 U.S.C. § 241; one-fourth as serious as mailing a threatening letter, 18 U.S.C. § 876; and one-sixth as serious as a conspiracy to destroy "war material" 18 U.S.C. § 2153.

■ Punishment is of course only one factor to be employed in making realistic appraisal of "the nature and circumstances of the offense charged." To adopt additional language of Mr. Chief Justice Vinson from Dennis v. United States, supra, 341 U.S. at pages 509, 516–517, 71 S.Ct. at pages 867, 871:

"Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, for if a society cannot protect its very structure from armed internal attack, it must follow that no subordinate value can be protected. * * *

"Their conspiracy to organize the Communist Party and to teach and advocate the overthrow of the Government of the United States by force and violence created a 'clear and present danger' of an attempt to overthrow the Government by force and violence."

So much for "the nature and [some of the] circumstances of the offense charged." See cases collected, 72 A.L.R. 810–814. Other "circumstances of the offense charged" will be mentioned later. The next criterion which Rule 46(a) directs the court to consider in fixing the amount of bail is "the weight of the evidence against [the accused]".

Upon the hearing of these motions the defendants advanced the view that the provision for consideration of the weight of the evidence "refers only to proceedings after trial and not before trial." Their position is best stated by their counsel in the following colloquy:

".The Court: Rule 46(c) states that one of the criteria to which the court should have regard in fixing the amount of bail is the weight of evidence against the defendants. Do the defendants here contend that this court is not to consider that criterion in fixing bail in this case at this time prior to trial as to any of these defendants?

"Mr. Margolis: That is precisely our contention, your Honor * * *."

The defendants now urge that Stack v. Boyle, supra [72 S.Ct. 3], requires the court to presume them innocent for the purpose of fixing bail. True, the Supreme Court states that: "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." But the

court there had reference to the right to reasonable bail while awaiting trial, and to the necessity of scrupulously safeguarding that right in order to prevent as nearly as can be "the infliction of punishment prior to conviction."

The presumption of innocence is but the reverse side of the talisman which lays upon a prosecutor the burden of proof of guilt beyond a reasonable doubt before the law will countenance a conviction. See Thayer, A Preliminary Treatise on Evidence at the Common Law, Appendix B, The Presumption of Innocence in Criminal Cases, 551–576 (1898). Which is to say that where the issue to be tried and adjudicated is guilt or innocence, the accused starts the trial of that issue with a clean slate; and "at the trial * * * the accused while kept well guarded, a prisoner, is yet to be treated as if no incriminating fact existed." Id. at 562.

To ascribe greater weight or wider scope to the presumption of innocence would be to fall into the error of Coffin v. United States, 1894, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481, which was corrected in Agnew v. United States, 1897, 165 U.S. 36, 49–51, 17 S.Ct. 235, 41 L.Ed. 624. See 9 Wigmore, Evidence § 2511 (3d ed. 1940); United States v. Nimerick, 2 Cir.1941, 118 F.2d 464, 467, 152 A.L.R. 620. In Stack v. Boyle, supra [72 S.Ct. 4.], the Court assumed the accused could not properly be presumed innocent for the purpose of fixing bail, pointing out that it would be an arbitrary act to infer "from the fact of indictment alone" need for bail "in an unusually high amount."

In some jurisdictions the courts, in fixing bail, have presumed the accused to be guilty of the charge laid in the indictment. See Hight v. United States, Iowa, 1845, Morris 407, 43 Am. Dec. 111; State v. Mills, N. C.1830, 13 N.C. 420, 2 Dev. 420; Ex parte Haynie, 1925, 32 Okl.Cr. 409, 241 P. 209; Ex parte Malley, 1927, 50 Nev. 248, 256 P. 512, 53 A.L.R. 395; Ex parte Horiuchi, 1939, 105 Cal.App. 714, 288 P. 708; State v. Richardson, Ohio Com.Pl.1939, 2 Ohio Supp. 1.

Mr. Justice Butler, sitting as Circuit Justice in United States v. Motlow, 7 Cir., 1926, 10 F.2d 657, 659, quoted from the opinion of Chief Justice Mason of the Supreme Court of Iowa in Hight v. United States, supra. To quote further:

"An indictment furnishes no presumption of guilt against a person when on trial, but so far as it regards all intermediate proceedings between indictment and trial, it furnishes the very strongest possible presumption of guilt, if a grand jury is the appropriate organ of the law to decide in the first instance upon the guilt or innocence of the accused, and their finding of a true bill is conclusive so far as to put him on trial * * *.

"The humanity of our law requires that before a person shall be punished, he shall be found guilty by two independent juries. The verdict of the first raises a full presumption of guilt up to the time of his trial before the second." Morris at page 410, 43 Am.Dec. at page 113.

The least that may be said then, in the light of reported precedents, is that for the purposes of fixing bail prior to trial "probable cause to believe that an offense has been committed and that the defendant has committed it" Fed.R.Crim.P. rules 5(c), 40(b)(3), (4), is furnished by the fact of indictment alone. See Beavers v. Henkel, 1904, 194 U.S. 73, 24 S.Ct. 605, 48 L.Ed. 882, 84–85; Hale v. Henkel, 1906, 201 U.S. 43, 60–63, 26 S.Ct. 370, 50 L.Ed. 652; United States v. Mulligan, 1935, 295 U.S. 396, 400, 55 S.Ct. 781, 79 L.Ed. 1501; see also 4 Bl. Comm. *296–*298; United States v. Jones, C.C.Pa.1813, 26 Fed.Cas. page 658, No. 15,495, 3 Wash.C.C. 224; People v. Goodwin, N.Y.Ct. of Gen.Sess. 1820, 1 Wheeler Crim. 434, 437; United States v. Averett, D.C.W.D.Va. 1928, 26 F.2d 676; People ex rel. Sammons v. Snow, 1930, 340 Ill. 464, 173 N.E. 8, 72 A.L.R. 798; contra: United State ex rel. Rubinstein v. Mulcahy, 2 Cir., 1946, 155 F.2d 1002.

The third criterion specified in Rule 46(c) is "the financial ability of the defendant to give bail". Each of the defendants gave evidence in support of his or her pending motion. Defendant William Schneider-

man testified on direct examination: "My income is $50 per week plus expenses. I have no other assets, real or personal." On cross-examination his testimony as to financial ability was in substantial part as follows:

"Q Was that earned income or income from investments? A Wages.

"Q By whom were you employed?

"Mr. Margolis: Objected to on the ground it is incompetent, irrelevant and immaterial, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds it might tend to incriminate me.

"Q By Mr. Tolin: Were you employed by the same employer for the year preceding the time of your arrest?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer that question on the same grounds.

"Q By Mr. Tolin: During what period of time were you employed by the person, firm, or association, whatever it was, that you were working for at the time of your arrest?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer that question on the same grounds previously stated.

"Q By Mr. Tolin: What was the nature of your employment? What did you do?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer that question on the same grounds as previously stated.

"Q By Mr. Tolin: Will you tell us, Mr. Schneiderman, the name of any employer by whom you have been employed during the course of the last 20 years?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds it might tend to incriminate me.

"   *   *   *   *   *   *

"Q Is there any bank account upon which you are an authorized agent for the purpose of writing checks, that is, is your signature the authorized signature for the purpose of withdrawal of moneys from any bank account? A I decline to answer that question on the ground it might tend to incriminate me.

"   *   *   *   *   *   *

"The Court: The ground is, as I understand it, Mr. Schneiderman, for all of your claims of immunity to answer, your sworn statement that the question calls for an answer which might tend to incriminate you under some federal law. Is that correct?

"The Witness: I so understand, your Honor.

"The Court: And that is your statement?

"The Witness: Yes.

"   *   *   *   *   *   *

"The Court: Do you have the privilege of drawing on any resources of any kind anywhere, financial resources?

"The Witness: I will decline to answer that question on the same grounds previously stated."

Defendant Dorothy Rosenblum Healey testified on direct examination: "I am employed at a salary of $50 per week * *." On cross-examination:

"Q By Mr. Tolin: And by whom were you employed at that time, meaning the time immediately prior to your arrest?

"Mr. Margolis: The same objection, your Honor, and I advise the witness, though, with respect to this question she may claim immunity.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds previously stated.

"Q By Mr. Tolin: How long were you in that employment, that particular employment prior to your arrest?

"Mr. Margolis: The same objection, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds previously stated.

"   *   *   *   *   *   *

"Q Are you an authorized signatory to any bank account? A I decline to an-

swer that question on the grounds previously stated."

Defendant Albert Jason Lima testified on direct examination: "My income is $60 per week." On cross-examination:

"Q By whom were you employed at the time of your arrest?

"Mr. Margolis: Objected to on the ground it is incompetent, irrelevant and immaterial, not proper cross-examination.

"The Witness: I decline to answer that question on the ground it might tend to incriminate me.

"Q By Mr. Tolin: How long were you employed by that employer, the same employer you had at the time of your arrest?

"Mr. Margolis: Same objection, and in addition, on the ground that there is no foundation, and it assumes facts not in evidence.

"The Witness: I decline to answer the question on the grounds it might tend to incriminate me.

"The Court: What are the facts it assumes not in evidence?

"Mr. Margolis: It assumes there had been an answer as to who his employer was, and it says the same employer.

"The Court: Mr. Margolis, do you urge upon the court that the court consider a man's answer on direct examination that he is employed at a certain number of dollars per week, and then that he be permitted on cross-examination to decline to say anything further about it?

"Mr. Margolis: That issue was before the Supreme Court and the Supreme Court indicated that is exactly what should be done.

*    *    *    *    *    *

"Q By Mr. Tolin: Mr. Lima, you have testified to having worked at various trades. Were you working at any one of those trades when you were arrested? A I decline to answer that question on the ground it might tend to incriminate me.

*    *    *    *    *    *

"Q By Mr. Tolin: You have stated in your affidavit your income is $60 a week. Do you have that income at this present time? A I believe I do have, yes, sir.

"Q Is that income derived from investments of some kind or is it an emolument of some office or position you hold? A It is a wage, as stated in the affidavit.

"Q Are you still rendering a service to that employer? A No, sir. I am in jail now.

"Q But your employer is continuing to pay you the money? A I believe it does. It doesn't pay me. I haven't received any wages from them myself since I have been in jail.

"Q It is paid for the benefit of your family? A I believe so.

"Q Who is that employer?

"Mr. Margolis: Objected to on the ground previously stated, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer on the grounds it might tend to incriminate me.

"Q By Mr. Tolin: What was the type of work you did for that employer?

"Mr. Margolis: Same objection, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer the question on the ground it might tend to incriminate me."

Defendant Oleta O'Connor Yates testified on cross-examination:

"Q Where were you employed at the time of your arrest?

"Mr. Margolis: Objected to, if your Honor please, on the ground it is incompetent, irrelevant and immaterial, not proper cross-examination, and a violation of this defendant's rights under the Fifth Amendment.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds that the question might tend to incriminate me * * *.

"Q What money were you receiving as a regular income at the time of your arrest? A I was receiving the sum of $40 per week.

"Q Was that a salary? A That was a salary or wages.

"Q Did you receive it in cash or by check?

"The Witness: I decline to answer that question on the grounds that the answer might tend to incriminate me.

"Q By Mr. Tolin: For whom were you rendering that service?

"The Witness: The same answer and the same reason.

\* \* \* \* \* \*

"Q Do you still have the income which you were receiving at the time of your arrest? A I don't know that either. I haven't received any money since I have been arrested.

"Q Have you notified your employer of your difficulty? A No, I have not. I haven't had a difficulty. My needs in jail have been taken care of by a Political Prisoners Welfare Committee.

"Q Have you notified your employer of the fact that you are under arrest?

"Mr. Margolis: Objected to on the ground it is incompetent, irrelevant and immaterial, not proper cross-examination, an attempt to deprive this witness of her rights under the Fifth Amendment.

"The Court: Overruled.

"The Witness: I decline to answer that question on the ground that the answer might tend to incriminate me.

"Q By Mr. Tolin: \* \* \* Have you within the past year been a person whose signature was authorized upon the checks of some other account?

"Mr. Margolis: Objected to on the ground it is incompetent, irrelevant and immaterial, not proper cross-examination.

"The Court: Overruled.

"The Witness: I decline to answer the question on the grounds the answer might tend to incriminate me.

\* \* \* \* \* \*

"The Court: What were you doing to earn this wage you say you received at the time of your arrest?

"The Witness: Well, I decline to answer that question on the ground that the answer may tend to incriminate me."

Defendant Carl Rude Lambert testified on direct examination: "I do not earn in excess of $50 per week." On cross-examination:

"Q What is your occupation, Mr. Lambert? A I have had several trades.

"Q I am referring to your occupation in which you were engaged at the time of your arrest.

"Mr. Margolis: I object to that, your Honor, on the ground that it is incompetent, irrelevant and immaterial, and it is a matter which would require the witness to testify against himself in violation of his rights under the Fifth Amendment.

"The Court: Overruled.

"The Witness: I accept the advice of counsel because it might tend to incriminate me.

"The Court: By that do you mean to testify that the question last asked you called for an answer which might tend to incriminate you under some federal law?

"The Witness: On the advice of the attorney, yes, sir. Under the Fifth Amendment, the answer, as counsel advised me, might tend to incriminate me.

"Q By Mr. Tolin: How long have you been engaged in that occupation prior to your arrest? A I—

"Mr. Margolis: The same objection. May the record show, your Honor, a continuing objection to all questions concerning occupation, on the same grounds.

"The Court: Yes. Objection is overruled.

"The Witness: I accept the advice of my counsel that answering that question might tend to incriminate me \* \* \*.

"Q By Mr. Tolin: My inquiry is: Who paid you that money?

"The Witness: I refuse to answer that question because answering it might incriminate me."

Defendant Philip Marshall Connelly testified on direct examination: "I am employed as Los Angeles editor of the Daily People's World, a newspaper of general circulation, at a salary of $50 per week." On cross-examination:

"Q You are connected in some way with the People's World, aren't you? A I am waiting for an indication from my counsel with respect to this line of questioning.

"Mr. Marshall: I think Mr. Tolin has reference to the statement in your affidavit, Mr. Connelly, as follows: 'I am employed as Los Angeles editor of the Daily People's World, a newspaper of general circulation, at a salary of $50 per week.' Is that the reference you had in mind, Mr. Tolin?

"Mr. Tolin: Yes, that is part of it.

"The Witness: That is an accurate statement of fact.

"Q By Mr. Tolin: Are you so employed at the present time? A I was actively employed up until the day of my arrest. I remain employed, but not actively, at this time.

"Q Who are the publishers of the Daily People's World?

"Mr. Marshall: We object to that as being incompetent, irrelevant and immaterial.

"The Court: Overruled.

"The Witness: On the advice of counsel I decline to answer in that the answer might tend to incriminate me.

"Q By Mr. Tolin: What was the nature of your employment? A As I stated in the affidavit, I was Los Angeles bureau editor.

"The Court: How long were you so employed?

"The Witness: Approximately two years, your Honor, prior to my arrest.

"Q By Mr. Tolin: Who was your immediate superior?

"Mr. Marshall: We object to that as being incompetent, irrelevant and immaterial.

"The Court: Overruled.

"Mr. Marshall: And upon the advice of counsel, I suggest you refuse to answer that question on the grounds of the Fifth Amendment.

"The Witness: Being so advised, I decline to answer on the ground the answer might incriminate me.

"Q By Mr. Tolin: In your capacity as an employee of the People's World, did you have supervision over other employees?

"Mr. Marshall: We object to that as being incompetent, irrelevant and immaterial.

"The Court: Overruled.

"Mr. Marshall: And the same advice to the witness.

"The Witness: On advice of counsel, I decline to answer. The answer might tend to incriminate me."

Defendant Rose Chernin Kusnitz testified on direct examination: "For the past several months I have been, and now am, employed as executive secretary of the Los Angeles Committee for Protection of the Foreign Born, a voluntary association existing for the assistance and defense of foreign-born residents of the United States. My salary in such employment is $30 per week plus $15 for expenses." On cross-examination:

"Q Who pays you or who did pay you immediately prior to your arrest the salary which you set forth in your affidavit of $30 per week plus expenses?

"Mr. Wirin: Your Honor, I would like to make an objection to this question on the grounds the question is incompetent, irrelevant and immaterial, and it is improper cross-examination based upon the affidavit; that the question pertains to an issue on the trial of the case rather than material to a hearing on bail. And I say to the witness that it is an area in which she may claim privilege against self-incrimination.

"The Court: The objection is overruled. Will you answer the question?

"The Witness: I refuse to answer the question on the grounds that it may tend to incriminate me."

Defendant Al Richmond testified on direct examination: "I am employed as a newspaperman, to wit, Executive Editor of the 'Daily People's World,' and I earn a salary of $50 per week." On cross-examination:

"Q Where were you employed at the time of your arrest? A At the Daily People's World.

"Q In Los Angeles or San Francisco? A San Francisco.

"Q What was the nature of your employment there? A I was the executive editor of the paper.

"Q  As the editor did you write articles for the paper?  A  On occasions I did.

"Q  You co-ordinated generally the other material which was published?  A  That is right.

"Q  Do you still hold that position?  A  Well, yes and no.  I don't actively exercise that function now but the title remains.

"Q  You have recited in your affidavit that you had a certain weekly income.  Was that income compensation for your services as executive editor of the Daily People's World?  A  That income was wages for that job.

"Q  Who paid those wages?  A  The Daily People's World.

\*    \*    \*    \*    \*    \*

"Q  How long had you been employed by the People's World prior to your arrest?  A  About 13 years, with the exception of three years that I was in the Army of the United States.

"Q  And were all those years of employment in an editorial capacity of one kind or another?  A  Yes, they were.

"Q  Do you know who managed the People's World?  A  I don't—

"Mr. Wirin:  Your Honor, at this time I will state to the court that in connection with questions of this kind, the defendant has consulted me and, as a member of the Bar and as an officer of this court, I have advised him that that matter is in area with respect to which he may properly claim the privilege against self-incrimination.

"The Witness:  And on that advice, I claim the privilege.

"The Court:  By that, I understand you to  \*  \*  \*  testify that the question last asked you calls for an answer which may tend to incriminate you under some federal law?

"The Witness:  That is correct, your Honor.

"Q  By Mr. Tolin:  Under whose direction did you do your work?  A  Well, I was the executive editor.  No one directed me.

"Q  Were you not responsible to some particular person or group of persons or authority for the discharge of directive duties in connection with your editorial work?  A  No.  In the immediate exercise of my job there was no authority over me.

"Q  Do you know Philip Marshall Connelly?

"Mr. Wirin:  Your Honor, I advise the witness that that is in area with respect to which he may properly claim his privilege of self-incrimination in view of the nature of the charge against him, now pending against him.

"The Witness:  Well, on that advice, I would like to claim the privilege against self-incrimination."

\*    \*    \*    \*    \*    \*

"The Court:  Who fixes your salary, the amount of your compensation?

"The Witness:  Let's see.  When I returned from the armed forces, I was asked what salary I thought was necessary.  I suggested the $50.

"The Court:  Was that fixed by some individual or by a board of directors?

"The Witness:  Well, at that time it was fixed on my suggestion.  As far as entering into the management of the paper, I decline to answer the question for fear of possible self-incrimination.

"The Court:  Who manages the paper?

"The Witness:  Well, the same answer holds that I gave in reply to the same question by the United States Attorney.

"The Court:  By that you mean the question calls for an answer which might tend to incriminate you under some federal law?

"The Witness:  That's right, your Honor.

\*    \*    \*    \*    \*    \*

"The Court:  Are you being paid now those wages you speak of?

"The Witness:  No, sir.  At my request, payment was stopped about—well, 10 or 11 weeks ago.

"The Court:  Who paid you when you were paid?

"The Witness:  The Daily People's World.

"The Court:  I mean who in the Daily People's World paid you?

"A  Well, that, again, enters into this area where I fear self-incrimination."

Defendant Ernest Otto Fox testified on direct examination: "My income is $40 per week." On cross-examination:

"Q You have recited in your affidavit that your income is $40 per week. From what source did you receive that income?

"The Witness: I decline to answer the question because it might tend to incriminate me.

"Q By Mr. Tolin: What was your occupation at the time that you were arrested?

"The Witness: I decline to answer the question because it might tend to incriminate me."

Defendant Henry Steinberg testified on direct examination: "I am presently earning the sum of $58.50 per week." On cross-examination:

"Q By Mr. Tolin: Mr. Steinberg, will you please state your occupation?

"Mr. Branton: I am going to object to that question, your Honor, as being immaterial and irrelevant.

"The Court: Overruled.

"The Witness: I refuse to answer that question, claiming immunity.

"The Court: By that do you mean the question calls for an answer which might tend to incriminate you under some federal law?

"The Witness: Yes, sir.

\* \* \* \* \* \*

"The Court: By whom were you next employed after you left this grocery company in 1946?

"Mr. Branton: To which question I am going to object, your Honor, as being immaterial and irrelevant.

"The Court: Overruled.

"The Witness: I refuse to answer that question for fear of self-incrimination."

Defendant Loretta Starvus Stack testified on direct examination: "I am employed as a waitress and earn in my employment between $40 and $45 per week." On cross-examination:

"Q Where were you employed prior to the part-time employment you have just told us about?

"Mr. Leonard: That is objected to on the ground it is incompetent, irrelevant and immaterial and remote, if your Honor please.

"The Court: Overruled.

"The Witness: I decline to answer on the grounds that the answer might tend to incriminate me.

\* \* \* \* \* \*

"Q What amount of money did you earn in your employment previously to the temporary employment? What was the rate of pay you had at that time? A I decline to answer that question.

Mr. Leonard: Objected to on the ground it is incompetent, irrelevant and immaterial and remote to the issues here involved.

"The Court: Overruled.

"The Witness: I decline to answer the question on the ground it might tend to incriminate me.

"Q By Mr. Tolin: Are you a person whose signature is authorized upon the checks of any other depositor?

"Mr. Leonard: Objected to on the ground it is incompetent, irrelevant and immaterial.

"The Court: Overruled.

"The Witness: I decline to answer the question on the ground such an answer might tend to incriminate me."

Defendant Mary Bernadette Doyle testified on direct examination: "My income is $47 per week." On cross-examination:

"The Court: Are you employed at the present time?

"The Witness: Yes, your Honor.

"The Court: By whom are you employed?

"The Witness: I decline to answer that question on the ground that my answer may tend to incriminate me under a federal law.

"The Court: What is the amount of your income?

"The Witness: $47 a week.

"The Court: How are you paid, by check or cash?

"The Witness: I decline to answer that question on the same grounds.

\* \* \* \* \* \*

"The Court: How long have you been engaged in your present employment?

"The Witness: I decline to answer that question on the basis of the fact that my answer may tend to incriminate me under a Federal statute."

The law does not compel a defendant to take the witness stand and testify, and no presumption or inference of any kind may be drawn from the failure of a defendant to take the witness stand. 18 U.S.C. § 3481. But, as Mr. Justice Douglas said in Johnson v. United States, 1943, 318 U.S. 189, 195, 63 S.Ct. 549, 552, 87 L.Ed. 704:

"The case of an accused who voluntarily takes the stand and the case of an accused who refrains from testifying (Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257) are of course vastly different. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054. His 'voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all.' 8 Wigmore, Evidence (3d Ed., 1940) § 2276(2). And see Fitzpatrick v. United States, 178 U.S. 304, 315, 316, 20 S.Ct. 944, 948, 949, 44 L.Ed. 1078; Powers v. United States, 223 U.S. 303, 314, 32 S.Ct. 281, 283, 56 L.Ed. 448."

In the words of the opinion in Caminetti v. United States, 1917, 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442: "where the accused takes the stand in his own behalf and voluntarily testifies for himself * * * he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it."

The Government conceded at the bar, however, that the privilege claimed by the defendants here was not waived by testimony voluntarily given upon direct examination. Cf. Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 19 A.L.R. 2d 378, and cases there cited. And it was pointed out in Johnson v. United States, supra, 318 U.S. at page 196, 63 S.Ct. at page 553, that "where the claim of privilege is asserted and unqualifiedly granted, the requirements of fair trial may preclude any comment. That certainly is true where the claim of privilege could not properly be denied. The rule which obtains when the accused fails to take the stand (Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650) is then applicable."

The rules just stated apply upon trial of issues raised by allegations of the indictment and denial made by plea of the accused. The proceedings upon these motions do not constitute a trial, but an *ad hoc* inquiry interlocutory in character into those factors which Rule 46(c) requires the court to consider in fixing the amount of bail. The defendants are nonetheless entitled in my opinion to the benefits of 18 U.S.C. § 3481 upon these proceedings. See former 28 U.S.C. § 632 (1940 ed.); Reviser's note 18 U.S.C. § 3481, H.R.Rep. No. 304, 80th Cong. (1948).

Both the nature of the proceedings and the fact they antedate the trial must necessarily limit their scope. It is neither practical nor proper for the court to reach definitive conclusions as to credibility or to make findings thereon in advance of the trial. To do so might prejudice the accused and take substance from the right of trial by jury.

"The character of the defendant" is the final criterion specified by Rule 46(c) for the court to consider in fixing the amount of bail. "A person's 'character'", said the court in Mester v. United States, D.C., E.D.N.Y.1947, 70 F.Supp. 118, 122, affirmed 332 U.S. 749, 68 S.Ct. 70, 92 L.Ed. 336, *rehearing denied*, 1947, 332 U.S. 820, 68 S.Ct. 150, 92 L.Ed. 397, "is usually thought to embrace all his qualities and deficiencies regarding traits of personality, behavior, integrity, temperament, consideration, sportsmanship, altruism, etc. which distinguish him as a human being from his fellow men. His disposition toward criminal acts is only one of the qualities which constitute his character."

The defendants offered no evidence of character in support of the pending motions. It is argued that no such evidence was necessary; that upon these pro-

ceedings they are entitled to the benefit of a presumption of good character. This contention runs counter to long established precedent in the courts of the United States that there is no presumption a defendant charged with crime is of good character.

As Mr. Justice Holmes explained in Greer v. United States, 1918, 245 U.S. 559, 560–561, 38 S.Ct. 209, 210, 62 L.Ed. 469:

"Obviously the character of the defendant was a matter of fact, which, if investigated, might turn out either way. It is not established as matter of law that all persons indicted are men of good character. * * *

"* * * In reason it should not be. A presumption upon a matter of fact, when it is not merely a disguise for some other principle, means that common experience shows the fact to be so generally true that courts may notice the truth. Whatever the scope of the presumption that a man is innocent of the specific crime charged, it cannot be said that by common experience the character of most people indicted by a grand jury is good."

Where, as here, there is absence of evidence of reputation as to any of the traits of character relevant to determination of the ultimate inquiry: what amount of bail "will insure the presence of the defendant"; where there is absence of evidence as to the nature of a defendant's work, the identity of his employer, or the duration of his employment, then ex necessitate appraisal of character is nebulous in the extreme. See Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168; 1 Wigmore, Evidence § 52 (3d Ed. 1940); 3 id. § 920.

The Government contends inter alia "that the defendants are a poor bail risk because of the likelihood of flight." More particularly the contention is that the defendants are members of the Communist Party of the United States, and as such "are not free agents" but are "agents of the superior authority within that party."

Without reviewing the evidence offered in support of the Government's contentions, it will suffice to say that such evidence and the indictment serve to establish, for the purpose of these proceedings, probable cause to believe that the defendants are members of the Communist Party and subject to the discipline of that party. See Beavers v. Henkel, supra, 194 U.S. at page 85, 24 S.Ct. 605.

One of the circumstances surrounding the offense charged is the fact that Section 2 of the Subversive Activities Control Act of 1950, 64 Stat. 987, 50 U.S.C.A. § 781 (15), provides in part:

"As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress finds that * * *

"(15) The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when * * * overthrow of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. Such preparations by Communist organizations in other countries have aided in supplanting existing governments. The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such worldwide conspiracy and designed to prevent it from accomplishing its purpose in the United States."

Moreover, in his concurrring opinion in Dennis v. United States, supra, 341 U.S. at pages 546–547, 71 S.Ct. at page 886, Mr. Justice Frankfurter pointed out: "The Communist Party was not designed * * * as an ordinary political party. For the circumstances of its organization, its aims

and methods, * * * we are concluded by the jury's verdict. The jury found that the Party rejects the basic premise of our political system—that change is to be brought about by nonviolent constitutional process. The jury found that the Party advocates the theory that there is a duty and necessity to overthrow the Government by force and violence. It found that the Party entertains and promotes this view, not as a prophetic insight or as a bit of unworldly speculation, but as a program for winning adherents and as a policy to be translated into action."

In Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 195, 71 S.Ct. 624, 660, 95 L.Ed. 817, Mr. Justice Reed, joined by the Chief Justice and Mr. Justice Minton, declared: " * * * Communism is well understood to mean a group seeking to overthrow by force and violence governments such as ours and to establish a new government based on public ownership and direction of productive property. Undoubtedly, there are reasonable grounds to conclude that accepted history teaches that revolution by force and violence to accomplish this end is a tenet of communists."

■ To borrow the language of Mr. Justice Jackson in American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 433, 70 S.Ct. 674, 701, 94 L.Ed. 925: "* * * 'Guilt by association' is an epithet frequently used and little explained, except that it is generally accompanied by another slogan, 'guilt is personal.' Of course it is; but personal guilt may be incurred by joining a conspiracy. That act of association makes one responsible for the acts of "others committed in pursuance of the association. It is wholly a question of the sufficiency of evidence of association to imply conspiracy. There is certainly sufficient evidence that all members owe allegiance to every detail of the Communist Party program and have assumed a duty actively to help execute it, so that Congress could, on familiar conspiracy principles, charge each member with responsibility for the goals and means of the Party."

■ Another of the circumstances surrounding the offense charged is the matter of common knowledge, of which the court may take judicial notice, Brown v. Piper, 1875, 91 U.S. 37, 42, 23 L.Ed. 200; United States v. Felin & Co., 1948, 334 U.S. 624, 63 S.Ct. 1238, 92 L.Ed. 1614, that persons may freely cross the border into the Dominion of Canada and likewise into the Republic of Mexico. The court may also take judicial notice of our treaties with those countries. Dainese v. Hale, 1875, 91 U.S. 13, 20, 23 L.Ed. 190; see also Ennis v. Smith, 1852, 14 How. 400, 55 U.S. 400, 427–430, 14 L.Ed. 472; The New York, 1899, 175 U.S. 187, 196–197, 20 S.Ct. 67, 44 L.Ed. 126.

Our 1842 extradition treaty with Great Britain, which includes within its scope the Dominion of Canada, provides for extradition only "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed * * *." 8 Stat. 572, 576, Aug. 22, 1842.

This provision, see 47 Stat. 2122, 2125, Art. 9, Aug. 9, 1932, served to prevent extradition from England by the United States of Gerhart Eisler who fled justice in this country in 1949. London Times, May 28, 1949, p. 2, col. 1.

Furthermore, our Supplementary Treaty of July 12, 1889 with Great Britain provides, 26 Stat. 1508, 1509:

"ARTICLE II. A fugitive criminal shall not be surrendered, if the offence in respect of which his surrender is demanded be one of a political character, or if he proves that the requisition for his surrender has in fact been made with a view to try or punish him for an offence of a political character.

"No person surrendered * * * shall be triable or tried, or be punished for any political crime or offence, or for any act connected therewith, committed previously to his extradition.

"If any question shall arise as to whether a case comes within the provisions of this Article, the decision of the authorities

of the government in whose jurisdiction the fugitive shall be at the time shall be final.

"ARTICLE III. No person surrendered * * * shall be triable or be tried for any crime or offence, committed prior to his extradition, other than the offence for which he was surrendered, until he shall have had an opportunity of returning to the country from which he was surrendered."

Our Extradition Treaty with the Republic of Mexico provides in part, 31 Stat. 1818, 1821, 1822–1823, April 24, 1899:

"Extradition shall not take place in any of the following cases:

"1. When the evidence of criminality presented by the demanding party would not justify, according to the laws of the place where the fugitive or person so charged shall be found, his or her apprehension and commitment for trial, if the crime or offense had been there committed.

"2. When the crime or offense charged shall be of a purely political character. ·

 * * * * * *

"A person who has been surrendered on account of one of the crimes or offenses mentioned in article 2 shall in no case be prosecuted and punished in the country in which his or her extradition has been granted, on account of a political crime or offense committed by "him or her previous to his or her extradition, or on account of an act connected with such a political crime or offense * * *.""

Defendant Schneiderman, who was defendant in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, testified upon the hearing of the pending motions:

"Q Have you since your original entry into the United States in your extreme youth, have you ever been out of the United States?

"Mr. Margolis: Objected to on the grounds it is incompetent, irrelevant and immaterial, not proper cross-examination.

"The Court: Overruled.

 * * * * * *

"The Witness: I decline to answer the question on the ground that it might tend to incriminate me.

"Q By Mr. Tolin: Have you ever been in the Republic of Mexico?

"Mr. Margolis: The same objection, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer that question on the same grounds.

 * * * * * *

"Q Mr. Schneiderman, have you made a trip back to visit in Russia or transact business there since you became a resident of the United States?

"Mr. Margolis: The same objection as to the last question, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer that question on the same grounds previously stated.

 * * * * * *

"The Court: Do you have any friends in the Republic of Mexico, acquaintances, Mr. Schneiderman?

"Mr. Margolis: Objected to on the ground it is incompetent, irrelevant and immaterial, not within the scope of the direct examination.

"The Court: Overruled.

"The Witness: May I consult with my attorney on this question?

"The Court: Oh, yes. You may step down. I expect to ask you about other countries to the same effect and any moneys you may have access to in any way."

(Mr. Schneiderman consulting with Mr. Margolis privately.)

"The Witness: On the advice of counsel, your Honor, I decline to answer that question on the grounds it might tend to incriminate me.

"The Court: Do you know any officials of the Republic of Mexico?

"The Witness: I decline to answer that question on the same grounds.

"The Court: Have you been in the Republic of Mexico during the past year?

"Mr. Margolis: If your Honor please, may the record show, so that I won't be interrupting constantly, my objection to this entire line of questioning?

"The Court: It may show it and the objection is overruled.

"The Witness: I decline to answer that question on the same grounds."

Defendant Dorothy Rosenblum Healey:

"Q By Mr. Tolin: When were you last in Mexico?

"Mr. Margolis: The same objection.

"A I believe the last time was when my husband, with my son and myself, were there on a vacation trip in last summer.

"Q By Mr. Tolin: In what part of Mexico did you travel?

"Mr. Margolis: The same objection.

"The Court: Overruled.

"A Ensenada.

\*        \*        \*        \*        \*        \*

"Q By Mr. Tolin: Will you tell us what other parts of Mexico you have been to?

"Mr. Margolis: The same objection.

"The Court: Overruled.

"A. I have been to Mazatlan and Juarez.

"Q By Mr. Tolin: Do you have acquaintances in those places?

"Mr. Margolis: The same objection.

"The Court: Overruled.

"The Witness: I decline to answer that question upon the grounds previously stated.

\*        \*        \*        \*        \*        \*

"Q Do you have friends or persons with whom you engage in correspondence in any foreign country? A I decline to answer that question on the grounds previously stated.

\*        \*        \*        \*        \*        \*

"The Court: Miss Healey, on this trip you made to Mexico last summer with your husband, did you visit any friends in Mexico?

"Mr. Margolis: Objected to on the grounds it is incompetent, irrelevant and immaterial.

"The Court: Overruled.

"The Witness: I decline to answer that question on the grounds previously stated.

"The Court: Do you know any public officials in Mexico?

"Mr. Margolis: Same objection, your Honor.

"The Court: Overruled.

"The Witness: I decline to answer the question on the grounds previously stated."

Defendant Oleta O'Connor Yates:

"The Court: Do you have friends and acquaintances there [in the Republic of Mexico]?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer that on the ground that the answer may tend to incriminate me.

"The Court: Have you been to the Dominion of Canada in recent years?

"The Witness: Yes, I have.

\*        \*        \*        \*        \*        \*

"The Court: Do you have friends and acquaintances there?

"Mr. Margolis: Same objection.

"The Court: Overruled.

"The Witness: I decline to answer on the ground the answer may tend to incriminate me."

Defendant Carl Rude Lambert:

"Q. Do you know any persons now residing in Canada?

"Mr. Margolis: I object to that, if your Honor please, on the ground it is incompetent, irrelevant and immaterial, not within the scope of direct examination, improper cross-examination, in violation of this witness' right under the Fifth Amendment.

"The Witness: I refuse to answer the question for fear of incrimination.

"The Court: Objection overruled.

\*        \*        \*        \*        \*        \*

"Q By Mr. Tolin: Do you know any people or any person residing in Mexico?

"Mr. Margolis: The same objection, your Honor.

"The Witness: I refuse to answer that question—

"The Court: Overruled.

"The Witness:—because it might incriminate me."

Defendant Philip M. Connelly:

"Q To what countries have you traveled? A To Canada and Mexico.

"Q Did you have union business in Canada? A I did on the most recent occasions that I traveled there.

"Q Do you know various people who reside in Canada?

"Mr. Marshall: Objected to as being incompetent, irrelevant and immaterial.

"The Court: Overruled.

"The Witness: On the advice of counsel, I decline to answer the question on the ground it might incriminate me.

"Q By Mr. Tolin: When you were in Canada, did you ever stop at the residence of friends, acquaintances, or associates?

"Mr. Marshall: Same objection, if your Honor please.

"The Court: Overruled.

"The Witness: On the advice of counsel, I decline to answer on the ground it might incriminate me.

\* \* \* \* \* \*

"Q Do you have friends and acquaintances who are resident in Mexico?

"Mr. Marshall: We object to that as being entirely incompetent, irrelevant and immaterial.

"The Court: Overruled.

"The Witness: On the advice of counsel, I decline to answer. The answer might tend to incriminate me."

Defendant Rose Chernin Kusnitz:

"The Court: \* \* \* Have you ever been in the Republic of Mexico?

"Mr. Wirin: That is objected to as incompetent, irrelevant and immaterial. And I had better repeat the same grounds, or may I be deemed to make an objection upon the grounds heretofore last stated?

"The Court: Yes, sir. Overruled.

"Mr. Wirin: And also, I would suggest to the witness it is an area in which she may claim immunity.

"The Witness: I refuse to answer the question on the grounds that it might tend to incriminate me.

"Q By The Court: Have you friends or acquaintances in the Republic of Mexico?

"The Witness: I refuse to answer this question on the same grounds, namely, that it may tend to incriminate me.

"Q By The Court: Have you been recently in communication with any person or persons in the Republic of Mexico?

"The Witness: May I consult?

"Mr. Wirin: That is objected to, your Honor, on the grounds heretofore stated.

"The Court: Objection overruled. Do you wish to consult with your attorney?

"The Witness: No. I think I can answer that. I refuse to answer this question on the grounds that it might tend to incriminate me.

"Q By The Court: Have you ever been in the Dominion of Canada?

"The Witness: May I consult with my attorney?

"The Court: Yes, you may."

(Witness consults with counsel at the counsel table.)

"The Court: Have you consulted with your attorney?

"The Witness: Yes, I have.

"The Court: Are you ready to answer the question?

\* \* \* \* \* \*

"A I have not been in the Dominion of Canada.

"Q By The Court: When did you come to the United States following your birth in Russia? A. May 14, 1940.

"Q Since that time have you departed the United States?

\* \* \* \* \* \*

"The Witness: I refuse to answer this question on the grounds that it might tend to incriminate me.

"Q By The Court: Do you have friends or acquaintances in the Dominion of Canada?

"The Witness: I refuse to answer this question on the grounds that it might tend to incriminate me.

"Q By The Court: Have you recently been in communication with any person or persons in the Dominion of Canada?

"The Witness: I refuse to answer this question on the grounds that it might tend to incriminate me."

Defendant Al Richmond:

"Q Have you ever been to Mexico? A That is a question I decline to answer on the grounds of possible self-incrimination.

\* \* \* \* \* \*

"The Court: Do you have any friends and acquaintances in the Republic of Mexico?

"The Witness: I decline to answer that on the grounds of possible self-incrimination."

Defendant Ernest Otto Fox:

"The Court: Do you know any people in the Republic of Mexico?

"The Witness: I decline to answer the question, your Honor, because it might tend to incriminate me.

"The Court: Do you know anyone in the Dominion of Canada?

"The Witness: I decline to answer the question because it might tend to incriminate me."

Defendant Loretta Starvus Stack:

"Q By Mr. Tolin: Mrs. Stack, have you ever been outside the United States? A I decline to answer the question on the ground that the answer might tend to incriminate me.

"Q Have you ever been in the nation of Mexico? A I decline to answer on the ground that the answer might tend to incriminate me."

■ The attorneys for defendants have expressed the conviction that their clients are political prisoners—victims of a wave of public hysteria—who are being subjected to persecution because they hold unpopular beliefs. If such protestations truly mirror the sincere beliefs of the defendants themselves, it does not offend either reason or human nature to envisage the prospect that persons so circumstanced might be strongly tempted to seek asylum in Mexico or Canada, looking to favorable interpretation of treaty provisions to protect them from extradition, and there await subsidence of the so-called wave of public hysteria. Cf. United States v. Burgman, D.C.1950, 89 F.Supp. 288, 289.

■ In ancient times admitting the accused to bail meant an actual bailment or delivery of the prisoner into the custody of his sureties. 4 Bl.Comm. *297. Under this practice, "all felonies were considered bailable before conviction." Petersdorff, Law of Bail *476 (1835).

Experience at length taught the inadvisability of bail, regardless of sureties, in cases where the defendant was charged with murder or other capital offense. "For then," as Blackstone expressed it, "the public is entitled to demand nothing less than the highest security that can be given, viz., the body of the accused, in order to insure that justice shall be done upon him, if guilty. Such persons, therefore * * * have no other sureties but the four walls of the prison." [4 Bl.Comm. *298.]

We retain today the ancient theory of bail. As Mr. Justice Field pointed out in Taylor v. Taintor, 1872, 16 Wall. 366, 83 U.S. 366, 371, 21 L.Ed. 287: "When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose."

And in Riese v. United States, 1869, 9 Wall. 13, 76 U.S. 13, 21–22: "By the recognizance the principal is, in the theory of the law, committed to the custody of the sureties as to jailers of his own choosing, not that he is, in point of fact, in this country at least, subjected or can be sub-

jected by them to constant imprisonment; but he is so far placed in their power that they may at any time arrest him upon the recognizance and surrender him to the court, and, to the extent necessary to accomplish this, may restrain him of his liberty. This power of arrest can only be exercised within the territory of the United States; and there is an implied covenant on the part of the principal with his sureties, when he is admitted to bail, that he will not depart out of this territory without their assent."

[See, also: United States v. Field, 2 Cir., 1951, 190 F.2d 554, 555; Longsdorf, Is Bail a Rich Man's Privilege? 1947, 7 F.R.D. 309.

The teachings of experience continue to dictate complete denial of bail as of right in capital cases. Fed.R.Crim. P. 46(a). However, there is but brief experience to teach what bail "will insure the presence of the defendant" when charged with a conspiracy to violate the Smith Act. It is a matter of general knowledge which the court may judicially notice, Parker v. Brown, 1943, 317 U.S. 341, 363, 63 S.Ct. 307, 87 L.Ed. 315; Jefferson Electric Co. v. N. L. R. B., 7 Cir.1939, 102 F.2d 949, 954; Greeson v. Imperial Irr. Dist., 9 Cir.1939, 59 F.2d 529, 531, that the eleven defendants, United States v. Foster, supra, D.C., 9 F.R.D. at 371, 374, similarly charged in Dennis v. United States, supra, 341 U.S. at page 495, 71 S.Ct. 857, were at liberty pending appeal. Williamson v. United States, 2 Cir., 1950, 184 F.2d 280, Mr. Justice Jackson as Circuit Justice. As related by counsel for the defendants, the facts were: "After conviction and pending appeal bail [for each defendant] was set at $20,000 * * *. And when the time came, following final affirmance by the Supreme Court of the United States, for the defendants to surrender themselves to serve their sentences, seven of the eleven defendants appeared and the other four did not appear and their bail was forfeited."

It is also a matter of common knowledge of which the court may take judicial notice that one of these four defendants was recently apprehended in the Republic of Mexico [Flynn, What's Story of Hall Ar-

rest?, Daily People's World, October 22, 1951, p. 6; Magil, Protests against Hall's Seizure Sweep Mexico, id., October 24, 1951, p. 4; Magil, The Hall Affair Shakes Mexico, id., November 9, 1951, p. 8; and see National Maritime Union of America v. Herzog, D.C.1948, 78 F.Supp. 146, 167–169, affirmed 1948, 334 U.S. 854, 68 S.Ct. 1529, 92 L.Ed. 1776; Jefferson Electric Co. v. N. L. R. B., supra, 102 F.2d at page 954.

The twelve defendants at bar contend that this court should shut out the light of that bail experience as to the eleven defendants similarly charged in the Dennis case. That contention should be met by pointing out that if our predecessors had refused to look to past experience—the conduct of persons similarly charged—they could never have learned judicially the inadvisability of granting bail as of right in capital cases. [See Pound, Justice According to Law, 60(1951).]

Rule 46(c) directs that the amount of bail "shall be such as in the judgment of the * * * judge * * * will insure the presence of the defendant * * *." Gone are the days when a judge was subject to penalty for taking insufficient bail. See Petersdorff, Law of Bail, supra 512–513; 4 Bl.Comm. *297. Today "insure" is interpreted to have the content of "assure." Stack v. Boyle, supra. The reason is aptly expressed by Mr. Justice Frankfurter and Mr. Justice Jackson, concurring in Stack v. Boyle, supra [72 S.Ct. 5]: "Admission to bail always involves a risk that the accused will take flight. That is a calculated risk which the law takes as the price of our system of justice."

The manifest duty of the judge, having regard to the criteria specified in Rule 46(c), is to fix an amount which in his conscientious judgment is sufficient to "insure the presence of the defendant". On the other hand, as the court admonished in Stack v. Boyle, supra: "Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is excessive' under the Eighth Amendment."

Narrowness of judicial experience in cases involving the Smith Act should serve

74

to broaden the bounds of reason within which reasonable persons may differ in fixing the amount of bail in such cases.

With due humility I confess lack of that gift of prescience which would enable a finding either that $5,000 bail would be unreasonably low or that $100,000 bail would be unreasonably high for each of the defendants in this case. See Meltzer v. United States, 9 Cir., 1951, 188 F.2d 913.

In fixing $50,000 upon hearing earlier motions to reduce, I found something of an experimenter's solace in the fact that Judge Goodman, following a hearing at San Francisco, fixed bail of $50,000 upon warrants for removal of defendants Lima, Yates, Lambert, Richmond, Fox, Stack and Doyle; and in the further fact that Judge Dimock, following a hearing in New York, fixed bail of $50,000 upon the warrant for removal of defendant Schneiderman.

Now I find the comfort of some guidance in the fact that the record made upon the previous motions to reduce, did not prompt either District Judge Harrison, or Circuit Judges Mathews, Healy and Bone, Stack v. Boyle, supra, 192 F.2d 56 or the Justices of the Supreme Court, Stack v. Boyle, supra, to say that the $50,000 bail as fixed falls outside the upper limits of the bounds of reason.

■■■ After hearing all evidence the defendants chose to offer, it appears that "the nature * * * of the offense charged" is uncommonly grave; that the indictment must be considered as establishing, for the purpose of these proceedings, "probable cause to believe that an offense has been committed and that the defendant has committed it" See Fed.R.Crim.P. 5(c), 40(b) (3, 4); Beavers v. Henkel, supra, 194 U.S. at pages 84–85, 24 S.Ct. 605; Hale v. Henkel, 1906, 201 U.S. 43, 60–63, 26 S.Ct. 370; United States v. Mulligan, 1935, 295 U.S. 396, 400, 55 S.Ct. 781; Barber v. United States, 4 Cir.1944, 142 F.2d 805, 807, certiorari denied, 1944, 322 U.S. 741, 64 S.Ct. 1054, 88 L.Ed. 1574; that the evidence offered by each defendant as to "financial ability * * * to give bail" is highly unsatisfactory; that the evidence

—or rather lack of evidence—as to "the character" of each defendant for the purposes of fixing bail is even more unsatisfactory.

Evidence as to financial ability and as to indicia of character usually involves matters peculiarly within the knowledge of the person whose character and financial ability are in question. The unsatisfactory state of the evidence as to those criteria in the proceedings at bar is due almost entirely to the election of the defendants to decline giving testimony upon constitutional grounds. While "no inferences whatever can be legitimately drawn * * * from the legal assertion by the witness of his constitutional right" Johnson v. United States, supra, 318 U.S. at page 196, 63 S.Ct. at page 553, that rule cannot serve to fill a gap in the proof. Cf. Kowalchuk v. United States, 6 Cir.1949, 176 F.2d 873, 877.

To paraphrase from the opinion in Caminetti v. United States, supra, 242 U.S. at pages 493–494, 37 S.Ct. 549:

A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so, no inference unfavorable to him may be drawn from that fact. But when a defendant takes the witness-stand in his own behalf, he voluntarily relinquishes his privilege of silence and ought not to be heard to speak alone of those things deemed to be for his interest and be silent where he or his counsel regard it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would aid him and refraining to speak upon related matters within his knowledge which, according to his testimony, might tend to incriminate him.

The foregoing observations apply to each of the defendants. There are of course some differences of degree in proof, in circumstances of family and residence, and in circumstances of employment. But these are not in my opinion such as to warrant any difference in treatment as to bail prior to trial in this case, bearing in mind the "circumstances of the offense charged," and especially the circumstance that the

defendants are not only accused as conspirators, but also as members of essentially the same conspiracy as that of which eleven of their alleged co-conspirators were convicted in the Dennis case.

Recalling what has been said about the limits of reasonableness in this matter, recalling that the defendants have not yet had the benefit of a trial on the grand jury's accusations, recalling how highly Americans prize freedom of expression of opinion and how reluctant to punish any lawful exercise of that freedom, it would be pleasant to be able conscientiously to grant the pending motions.

It is my judgment, however, having regard to the criteria which Rule 46(c) commands the court to consider, that no less an amount than $50,000 bail as to each of the defendants "will insure the presence" within the meaning of the rule. The motion of each of the defendants to reduce the bail of $50,000 heretofore fixed must therefore be denied; and it is so ordered.